**WESTLANDS WATER DISTRICT, San Benito Water District, San Luis Water District, and Panoche Water District, Plaintiffs,**

v.

**UNITED STATES of America, DEPARTMENT OF the INTERIOR, BUREAU OF RECLAMATION; United States of America, Dept. of Commerce, National Marine Fisheries Service; Roland H. Brown, Secretary of Commerce; Bruce Babbitt, Secretary of the Interior, Defendants.**

No. CV–F–93–5327 OWW SSH.

United States District Court,
E.D. California,
Fresno Division.

March 3, 1994.

Thomas W. Birmingham, Sacramento, CA, Jess P. Telles, Dos Palos, CA, for plaintiffs.

Gary Sawyers, Bolen, Fransen & Boostrom, Fresno, CA, John L. Marshall, U.S. Dept. of Justice, Environment & Natural Resources Division, Washington, DC, Laurens H. Silver, Michael Sherwood, Sierra Club Legal Defense Fund, San Francisco, CA, Lori Potter, Sierra Club Legal Defense Fund, Denver, CO, Virginia S. Albrecht, Daniel O'Hanlon, Beveridge and Diamond, San Francisco, CA, Daniel M. Dooley, Kenneth A. Kuney, Dooley & Herr, Visalia, CA, Richard M. Archbold, Jeanne M. Zolezzi, Neumiller & Beardslee, Stockton, CA, William Smiland, Theodore A. Chester, Jr., Christopher G. Foster, Donnelly Clark Chase & Smiland, Los Angeles, CA, Hamilton Candee, Natural Resources Defense Counsel, Brian E. Gray, San Francisco, CA, Clifford W. Schulz, Kronick Moskovitz Tiedemann & Girard, Sacramento, CA, Gregory K. Wilkinson, Dennis M. Cota, Janice L. Weis, Best Best & Krieger, Riverside, CA, Denslow B. Green, Green Green & Rigby, Madera, CA, Mollie Beattie, Director, Dept. of Interior, Fish and Wildlife Service, Washington, DC, Maria A. Iizuka, U.S. Dept. of Justice, Land & Natural Resources Div., Sacramento, CA, John Clark, Phil Atkins–Pattenson, Pettit and Martin, San Francisco, CA, John Krautkraemer, Environmental Defense Fund, Oakland, CA, Diane Rathman, Jess P. Telles, Jr.,

Linneman Burgess Telles Vanatta & Vierra, Dos Palos, CA, Michael V. Sexton, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, CA, Ernest Conant, Scott Kuney, Young Woodridge, Paulden Self & Farr, Bakersfield, CA, Janet Reno, U.S. Atty. Gen., Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER RE: DEFENDANTS AND DEFENDANTS–IN–INTERVENTION MOTIONS TO DISMISS

WANGER, District Judge.

### I. INTRODUCTION

This case is before the court on motions of the Defendants, U.S.A., Department of the Interior, Bureau of Reclamation, U.S. Department of Commerce, National Marine Fisheries Service, Roland H. Brown, Secretary of Commerce, and Bruce Babbitt, Secretary of the Interior ("Federal Defendants") and Defendants-in-Intervention, the National Resources Defense Council, United Anglers of California, Save San Francisco Bay Association, California Waterfowl Association, Sierra Club, Bay Institute of San Francisco, Environmental Defense Fund, California Striped Bass Association, Trout Unlimited of California, Sacramento River Council, California Sportfishing Protection Alliance, and Pacific Coast Federation of Fisherman's Association, who represent environmental interests (the "Environmental Intervenors"), to dismiss the complaints of plaintiffs Westlands Water District, San Benito Water District, San Luis Water District and Panoche Water District (collectively "Westlands"); and Plaintiffs–in–Intervention Kern County Water Agency; the Friant Users Water Users Authority;[1] The San Joaquin River Exchange Contractors; the Area I parties;[2]

1. The complaint filed by the Friant Water Users Authority is also brought by: 1) Hills Valley Irrigation District; 2) Pixley Irrigation District; 3) Rag Gulch Water District; 4) Orange Cove Irrigation District; 5) Lindsay–Strathmore Irrigation District; 6) Madera Irrigation District; 7) Chowchilla Irrigation District; 8) Shafter–Wasco Irrigation District; 9) Friant Power Authority.

2. The Area I parties are the following landowners and/or water users within the Westlands Water District: Francis Orff, Brooks Farms II,

the Stockton East Water District, the Central San Joaquin Water Conservation District, the County of San Joaquin, the City of Stockton, and the California Water Service Company.

### II. BACKGROUND

#### Westlands Claims

Westlands complains that the 50% allotment by the U.S. Department of the Interior's Bureau of Reclamation ("Bureau") to them in 1993 resulted from major changes in the Bureau's operation of the Federal Central Valley Project ("CVP") due to three events:

1. Enactment of the CVPIA, public law, 102–575, 106 stat. 4600;

2. Issuance of the Biological Opinion for the operation of the CVP and California State Water Project for the winter-run Chinook Salmon by the National Marine Fisheries Service ("NMFS"); and

3. Listing of the Delta smelt as a threatened species pursuant to section 4 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1533.

Five claims are stated in the Westlands complaint:

1. The first alleges the Bureau's implementation of the CVPIA and ESA impairs Westlands' vested rights under respective water contracts, in violation of the Fifth Amendment due process clause.

2. The second alleges the Bureau violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332, et seq., by failing to conduct an environmental review before changing operational standards and criteria to implement the CVPIA or to find

Brooks Farm IV, Brooks Farm V, G.S. Farms, Five–D Westside Farms, Inc., R & S Farming, Cardella Ranch, Gram Family Farms II, Edwin R. O'Neill, BRO Partnership, BTO Partnership, EJC Partnership, ERO Partnership, JEO Partnership, SLO Partnership, TBO Partnership, S.C. Stefanopoulos Trust, Elena Stefanopoulos Trust, Estate of Helen Stamoules, D.D. Stefanopoulos Trust, Pagon Stefanopoulos, Sumner Peck Ranch, Inc., Y. Stephen Pilibos, and Pilibos Children's Trust.

no jeopardy in the ESA consultation for the Delta smelt;

3. The third alleges the Winter Run Biological Opinion (BO) issued by NMFS fails to conform to section 7 of the ESA and regulations thereunder and is arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act (APA);

4. The fourth alleges the NMFS and the Bureau violated NEPA by failing to conduct an environmental review before issuance of the winter-run BO and before implementing the "reasonable and prudent alternative" prescribed; and

5. The fifth alleges the Bureau's operation of the CVP for fishery and environmental purposes constitutes a reallocation of water in deprivation of Westlands' vested rights entitling Westlands to just compensation under the Fifth Amendment.

Each District alleges it has a water service contract with the United States to receive a specified quantity of water from the San Luis Unit of the CVP. Complaint ¶ 13, 18, 20 and 22. Each contract contains a clause prohibiting disturbance of the rights to the beneficial use of water thereunder so long as the Districts meet their obligations under each contract, and a provision that if Congress amends the Federal Reclamation Law, "the United States agrees, at the option of the District," to negotiate amendment of the contract consistent with the Amendment of Reclamation Law. Complaint ¶ 13. The contracts of San Luis and Panoche Districts also provide the: "United States agrees that it will not voluntarily and knowingly ... do anything which would limit its ability to deliver water that is available to it from the Sacramento–San Joaquin Delta to the contractor and others presently entitled thereto." Complaint ¶¶ 20, 22. Each District claims to have fulfilled all its obligations under the contracts. Complaint ¶¶ 16, 19, 21 and 23.

In February, 1989, NMFS listed the winter-run Chinook salmon as a threatened species under section 4 of the ESA. (Complaint ¶ 25.) On February 26, 1991, NMFS requested the Bureau formally consult under ESA section 7 to determine whether the Bureau's operation of the CVP jeopardized the continued existence of the winter-run Chinook salmon. (Complaint ¶ 26.) Following consultation, on February 12, 1993, NMFS issued the BO, which concluded the proposed long-term operation of the CVP would likely jeopardize the continued existence of the winter-run Chinook salmon. (Complaint ¶ 30.) The BO identified a "reasonable and prudent alternative," to avoid jeopardy to the species. (Complaint ¶ 30.) In preparing the BO, NMFS did not consider economic or environmental impacts. (Complaint ¶ 31.)

The CVPIA was enacted October 30, 1992. (Complaint ¶ 27.) The CVP's purpose and obligations are thereby modified to, among other things, require dedication annually of 800,000.00 acre feet of CVP water for fish, wildlife and habitat restoration purposes; to release not less than 340,000 acre feet per year to the Trinity River for fishery restoration, propagation and maintenance; to provide for water supplies of suitable quality to maintain and improve wetland habitat; to assess and collect annual restoration payments from the Districts, as beneficiaries of the CVP. (Complaint ¶ 28.)

The United States Fish and Wildlife Service ("Service") on March 5, 1993, listed the Delta smelt as a threatened species under ESA section 4. On April 1, 1993, the Bureau requested the service formally consult under ESA section 7 on how CVP 1993 Operations Criteria and Plan ("OC") affected the Delta smelt. (Complaint ¶ 38.) The Bureau then modified its Central Valley OC to allow the service to make a finding of no jeopardy in its Delta smelt opinion. (Complaint ¶ 38, 39, 54.) No environmental review was conducted for such modification. (Complaint ¶ 55.)

On May 26, 1993, the Service issued the "Formal Consultation on CVP Operations Criteria and Plan for 1993: Effects on Delta Smelt" (Delta Smelt BO) which concluded the 1993 plan was not likely to jeopardize the continued existence of the Delta smelt. (Complaint ¶ 40.)[3]

---

**3.** The parties intend to amend the complaint to name the Service as a party to this action.

During 1993, the Bureau issued three declarations of available CVP water supplies, finally allocating to agricultural contractors south of the Sacramento–San Joaquin Rivers Delta ("Delta"), including Districts, a 50% water supply allotment. (Complaint ¶ 32, 33, 34.) The Declaration was contingent upon the Bureau's ability to convey water under requirements of the ESA. Although the 50% allotment was not later reduced because 1993 was not a critical dry year, Westlands was notified it should anticipate future water reductions unrelated to climatic conditions. (Complaint ¶ 35.)

During 1993, sufficient water supplies existed within the CVP to fully satisfy the Districts' respective contractual entitlements but for the complained of actions. (Complaint ¶ 42.)

On May 17, 1993, the Westlands plaintiffs filed their initial complaint. The following parties have since filed complaints in intervention: 1) Kern County Water Agency; 2) The Friant Users Water Users Authority; 3) The San Joaquin River Exchange Contractors; 4) The Area I parties; and the County of Fresno.[4] A separate action was filed in the Sacramento Division of this Court by the Stockton East Water District, the Central San Joaquin Water Conservation District, the County of San Joaquin, the City of Stockton, and the California Water Service Company (collectively the "Stockton plaintiffs"). That action was transferred as a related case and consolidated for hearing with these motions.

## Friant Water Users Claims

The Friant Water Users's ("Friant") complaint-in-intervention alleges claims that are substantially similar to Westlands' Third and Fourth Claims for relief.

## Kern County Water Agency

The Kern County Water Agency's ("KWA") complaint-in-intervention asserts two claims for relief. Those claims are substantially similar to the Westlands Third and Fourth Claims for Relief. KWA also alleges that the Commerce Secretary and the NMFS violated the ESA by issuing the BO and in failing to include local water agencies in ef-

forts to resolve water resource issues in the consultation process. Complaint, at ¶ 28.

## Exchange Contractors Claims

The San Joaquin River Exchange Contractors Water Authority (Exchange Contractors) is made up of four public and private entities, which, either directly or through a predecessor in interest, hold pre–1914 riparian water rights on the San Joaquin River, which they contracted to exchange for a water supply from the United States provided from the Sacramento–San Joaquin River Delta by means of the federal Delta–Mendota Canal.

The Exchange Contractors request that judicial notice be taken that the manner in which the Bureau has operated the CVP to comply with the reasonable and prudent alternative set forth in the disputed Biological Opinion has generally impaired the Bureau's ability to make agricultural water deliveries to its contractors south of the Delta, which will create specified adverse environmental impacts. Further, judicial notice under Federal Rule of Evidence 201(b) is requested that the Bureau's operation of the CVP to comply with the reasonable and prudent alternative in the biological opinion has created uncertainty regarding agricultural water deliveries south of the Delta. The first request for judicial notice cannot be granted for it refers to facts reasonably in dispute. It is not disputable that uncertainty has been created by the Bureau regarding agricultural water deliveries south of the Delta. The first request for judicial notice is denied. The second request is granted. Fed.Rule of Evid. 201(b)(1) & (2). Requests for judicial notice by Friant Intervenors, the Stockton plaintiffs, federal defendants and environmental intervenors of various court and public documents are granted. Fed.Rule of Evid. 201(b)(2).

The Exchange Contractors, and others, complain that the reasonable and prudent alternative directs the Bureau to make its February 15 forecast of deliverable water based upon a conservative 90% probability of exceedance. (Biological Opinion ¶ VI–1.) The Exchange Contractors allege a 90%

4. Motions to dismiss the County of Fresno's complaint in intervention will be separately treated.

probability of exceedance water forecast is unnecessary and unreasonable for all but hydrologic dry water years and should not be used by the Bureau except in dry water years.

Among other adverse environmental impacts described in Westlands and the Friant intervenors complaints, the Exchange Contractors allege that reductions in water allocations will result in a proliferation of new wells drilled and old wells retrofitted in areas within or immediately adjacent to Exchange Contractors' service areas, that will result in ground water level changes and irreversible damages to ground water quality as ground water is substituted for service water reductions.

The Exchange Contractors identify four levels of major federal action alleged to significantly affect the quality of the human environment: 1) The federal defendants' consultation pursuant to the ESA, preparation of the Biological Opinion, and selection of a reasonable and prudent alternative for the long term operation of the CVP; 2) Modification of operation of the CVP to implement procedures contained within the reasonable and prudent alternative; 3) The Bureau's modification of the operation of the CVP to implement the CVPIA by appropriation and diversion from agricultural use to environmental use of over 1.2 million acre feet of water; and 4) The February 25, 1993, issuance of "Interim Guidelines for Implementation of Water Transfers Under Title and XXXIV of Public Law 102–575." It is alleged that no review pursuant to NEPA was conducted for any of these levels of federal action, and that no data or information base was compiled or available to federal decisionmakers to consider the impact on implementation of their decisions.

### Area I's Claims

Area I intervenors are various landowners and water users in Area I of the Westlands Water District, which is located in the San Luis Unit of the Central Valley Project. The Area I complaint alleges that the three types of reductions implemented in the 1993 water year are not mandated by statute, i.e., the CVPIA. (Complaint ¶ 35.) The complaint alleges the government withheld 59,000 acre feet to serve Wetland habitat areas; (Complaint ¶ 30) 166,000 acre feet to protect Delta Smelt (*Id.*) and 225,000 acre feet to protect Sacramento River Winter Run Chinook Salmon. (Complaint ¶¶ 30, 35)

Area I claims that the government must plead and prove compliance with the CVPIA including:

1.) Its endeavor to diversify water supply services in order to minimize possible adverse affects on CVP contractors; § 3406(d)(1);

2.) The supplementation of water deliveries under § 3406(d)(1) through voluntary measures, which do not require involuntary reallocations of project yield;

3.) Whether it entered into such agreements as may be necessary to implement the CVPIA with other appropriate parties pursuant to §§ 3408(a) and 3406(d)(1);

4.) That the wetland habitat areas specified in § 3406(d) are to be provided with CVP water;

5.) What, if any, water regulations the government has promulgated to implement the CVPIA, § 3408(a);

6.) That it has not altered the terms of any final judicial decree confirming or determining water rights, § 3408(k);

7.) Whether it obtained modification of permits and licenses of which Area I landowners are beneficiaries, § 3411(a).

Area I further alleges that the dedication of 800,000 acre feet of CVP yield for fish and wildlife purposes was not mandated, was not done in compliance with, and was a violation of the CVPIA. (Complaint ¶¶ 35(f), (g), (h)). That the government has not operated the CVP in the disputed year to meet all obligations under Federal law, state law, or "in consultation with ... affected interests," §§ 3411(a), 3406(b); nor has the government alleged the 1993–1994 CVP yield, nor whether all 800,000 acre feet are needed for CVPIA purposes, § 3406(b)(2)(D); nor pled compliance with §§ 3408(a), (k), and 3411(a).

Area I claims the government implemented a 225,000 acre feet reduction for salmon protection under the ESA, (Complaint ¶ 28,

35(e)(h)(i)); which was not "mandated," "done in compliance with," and was a "violation" of the ESA. Area I also claims the government violated reclamation law, § 1(a) of the San Luis Act, to furnish irrigation water for land in the Federal San Luis Unit Service Area and the government's mandatory obligation to sell and deliver 900,000 acre feet of water to Area I. (Complaint ¶¶ 16, 35(a) and (c).)

The Area I complaint alleges various reclamation statutes obligate the government to pay for the cost of constructing water supply facilities by selling water to irrigators. (Complaint ¶¶ 14, 35(a) and (c).) Further, that irrigation users have priority over fish and wildlife uses. That Reclamation statutes are "mandatory" and require sale and delivery. (Complaint ¶¶ 15, 35(a) and (c).) See also § 3406(a)(2) fish and wildlife purposes are on an "equal priority" with irrigation purposes. San Luis Act § 1(a) makes fish and wildlife purposes "incidents" to the "principal" purpose of the Act, irrigation.

### Stockton Parties Claims

The Stockton Parties have entered into contracts with the Bureau for water from the New Melones Dam and Reservoir ("New Melones Unit") on the Stanislaus River. The Stockton East contract provides for the right to receive "interim" water. Complaint, at ¶ 18. Interim water is water determined to be available from the New Melones Unit which might in the future be directed to other users in the Stanislaus River basin. *Id.* In reliance on the Stockton East contract, Stockton East entered into a water delivery service contract with the California Water Service Company and the City of Stockton. Complaint, at ¶ 20.

The Central San Joaquin Water Conservation District ("Central San Joaquin") contract provides both an "interim" and a "firm" sup-

ply of water. Complaint, at ¶ 19. "Firm water" is to be provided as part of CVP obligations, with shortages expected in critically dry years. *Id.* Both Stockton East and Central San Joaquin, pursuant to obligations in their contracts with the Bureau, constructed a water conveyance system at a cost in excess of $50 million dollars. Complaint, at ¶¶ 23, 24.

In early 1993, the Bureau and the NMFS determined that 200,000 acre feet of the 800,000 acre feet needed for CVPIA compliance would be allocated from the New Melones Unit. Complaint, at ¶ 32. Of this amount, approximately 115,000 acre feet were to be held in storage, although some or all of the water may be spilled or lost if the 1993 winter is wet. Complaint at ¶¶ 32, 35. On June 28, 1993, the Bureau orally advised Stockton East and Central San Joaquin that it would not deliver any water during 1993. Complaint, at ¶ 37. Absent this decision, the complaint alleges that sufficient water would be available in the New Melones Unit to satisfy the Bureau's contractual obligations to the Stockton parties. Complaint, at ¶ 39.

The Stockton parties' complaint alleges claims substantially similar to Westlands' First, Second and Third Claims for Relief, and two additional claims, not subject of the Federal Defendants' motions to dismiss:

1) The Third alleges that the reallocation of 200,000 acre feet outside the permit area of New Melones was contrary to CVPIA § 3410; and

2) The Fourth alleges that the government acted arbitrarily and capriciously in the reallocation decision.

The following chart summarizes the parties' claims that are the subject of these motions to dismiss:

| Claim for Relief | Westlands, et al. | Kern County Water Agency, et al. | San Joaquin Exchange Contractors | Friant Water Users Authority | Area I | Stockton East Water, et al. |
|---|---|---|---|---|---|---|
| "Takings" Claim/5th Amendment | Fifth Claim for Relief | | | | First Claim for Relief—Sub. (i) | Fifth Claim for Relief |
| Due Process/5th Amendment | First Claim for Relief | | | | First Claim for Relief—Sub. (l) | First Claim for Relief |
| NEPA: EIS req'd for compliance with CVPIA | Second Claim for Relief | | First Claim for Relief | | First Claim for Relief—Sub. (h) | Second Claim for Relief |

| | | | | | |
|---|---|---|---|---|---|
| NEPA: EIS req'd for Biological Opinion | Fourth Claim for Relief | First Claim for Relief | First Claim for Relief | First Claim for Relief | |
| NEPA: EIS req'd for conduct permitting "No jeopardy" finding for Delta Smelt | Second Claim for Relief | | | | |
| ESA: Adequacy of Biological Opinion | Third Claim for Relief | Second Claim for Relief | Second Claim for Relief | Second Claim for Relief | First Claim for Relief (Sub. (i) & (j)) |

## III. LEGAL STANDARD FOR A MOTION TO DISMISS

A motion to dismiss for failure to state a claim under F.R.C.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Hall v. Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988) (*quoting* 5 C. Wright & A. Miller, *Federal Practice & Procedure*, Civil § 1357, at 598 (1969)). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

In deciding a motion to dismiss, the court "must accept as true all material allegations in the complaint and construe them in the light most favorable to" the plaintiff. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). Yet, the court need not accept as true allegations that contradict facts which may be judicially noticed. *Mullis v. United States Bank Ct.*, 828 F.2d 1385, 1388 (9th Cir.1987), *cert. denied*, 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988). For example, the court may consider matters of public record including pleadings, orders, and other papers filed with the court or records of administrative bodies. *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986). The court need not accept conclusory allegations, nor unreasonable inferences or unwarranted deductions of fact. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). In addition, the court may disregard allegations in the complaint if contradicted by facts established by exhibits attached to the complaint. *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987).

## IV. DISCUSSION

### The Constitutional Claims

The movants argue that the districts are unable to state a claim for relief, because the contracts at issue confer no vested property interest that warrants constitutional protection.

### Collateral Estoppel

The movants argue that Westlands is collaterally estopped from asserting either a due process or a takings claim premised on a contractual relationship with the United States, by the decisions rendered in *Barcellos v. Wolfsen*, 849 F.Supp. 717 (1993). Movants claim those decisions determined landowners within Area I of the Westlands District had no absolute property right warranting constitutional protection to the full allotment of water under their contract with the Bureau, so that Westlands' First and Fifth Claims cannot state claims for relief.

Westlands relies on portions of the Memorandum Opinions issued in *Barcellos*, dated June 18, 1993:

Movants make a number of legal challenges to these alleged acts. *Many must be rejected* as they are incorrectly premised on the Movants having an absolute right under the 1963 contract and/or reclamation law to a full allocation of water. These arguments are: .... 3) *The ESA and CVPIA are unconstitutional as applied as they violate Area I's contract rights under the due process clause;* ....

(emphasis added). The September 9, 1993 Memorandum Opinion states:

Assuming, *arguendo*, that Article 11 by its plain language is not controlling and the 1963 Contract obligates Federal Defendants to supply, without excuse, 900,000 acre-feet of water, Movant's argument is still based on the erroneous belief that Congress may never enact laws that have the direct or indirect effect of modifying existing contracts. *Movants incorrectly contend that this modification effects a taking and violation of their due process rights . . . .*

. . . . A reading of the 1963 Contract reveals no language or intent that "Congress surrendered in clear and absolute language its right" to adjust the amount of water supplied under the contract. To the contrary, Article 11 specifically allows such adjustments when shortages occur.

(emphasis added).

Westlands argues that the ruling on its Motion to Enforce Judgment is without preclusive effect, because it was without prejudice. The Memorandum Opinion of June 18, 1993 states,

The Motion to enforce judgment is DENIED, without prejudice, pending the outcome of the Westlands' case. Should Westlands succeed there, the Movants may renew their motion, and attempt to demonstrate that the Bureau acted in an unreasonable manner, not contemplated by the parties to the 1993 contract in curtailing their allotment of water.

■ Collateral estoppel bars relitigation of identical issues that were resolved in a prior proceeding, even if the later suit involves a different cause of action. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1399 (9th Cir.1992). The doctrine is inapplicable if the issues are merely similar. *Shapley v. Nevada Board of State Prison Comrs.*, 766 F.2d 404, 408 (9th Cir.1985). "To be 'final' for collateral estoppel purposes, a decision need not possess 'finality' in the sense of 28 U.S.C. § 1291." *Luben Industries, Inc. v. U.S.*, 707 F.2d 1037, 1040 (9th Cir.1983). Any prior adjudication of an issue in another action that is "sufficiently firm" can be accorded preclusive effect. *Id.* As stated in Comment "g" to § 13 of the Restatement of Judgments,

[P]reclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for purpose of preclusion.

quoted in *Luben Industries*, 707 F.2d at 1040. A judgment is not final if further judicial action by the court is required to determine the matter litigated. *Russell v. Commissioner*, 678 F.2d 782, 786 (9th Cir. 1982).

■ As a general matter, dismissals without prejudice do not constitute a final decision. *Brandenfels v. Heckler*, 716 F.2d 553, 557 (9th Cir.1983) (dismissal without prejudice of administrative proceeding has no preclusive effect). An order on a post-trial motion to enforce judgment is not analogous to an order made during pre-trial stages of litigation.

■ The *Barcellos* opinions left certain issues open for later resolution: 1) the validity of the allegedly applicable environmental statues: the CVPIA and section 7 of the Endangered Species Act; and 2) whether the Bureau has correctly complied with those statutes in its water allocation decisions, to make the water taking from plaintiffs neither arbitrary or capricious, or otherwise illegal. Nor did the decisions finally determine the questions presented by application of the CVPIA, the Bureau's change of management philosophy for the CVP, and its actions to conform with alleged ESA requirements. To the extent plaintiffs' constitutional claims are based on these grounds, collateral estoppel does not apply.

Westlands and any other party to the contract at issue in *Barcellos* cannot relitigate that that contract provides an absolute vested contract right to water that cannot under any condition be altered by the Federal Defendants' reasonable actions, taken pursuant to valid, subsequent legislation. That issue was resolved against them and no further judicial action is required. The parties were fully heard, and the order supported by a

reasoned decision. Under *Luben*, the findings made there are "sufficiently firm" to be accorded preclusive effect.[5] The post-judgment motions assumed for the purposes of decision that the Bureau was acting properly, pursuant to later valid legislation; the propriety of the Bureau's methods of implementing its water allocation decisions was not decided. That issue as to Westlands and all other plaintiffs, is not precluded.

### The Westlands Complaint

Westlands alleges that the Regional Director of the Bureau issued declarations of available CVP supplies for the 1993 water year, to meet the obligations of the CVPIA and the ESA. Complaint, ¶ 34. That the CVP contains adequate water supplies to comply with the contacts, "absent the Bureau's operation of the CVP to comply with PL 102–575 and the Endangered Species Act." Complaint, ¶ 42. Moreover:

47. The Bureau's reduction of Westlands', San Benito's, San Luis', and Panoche's vested rights to CVP water entitlement resulting from implementation of PL 102–575 and the Endangered Species Act violates each party's due process rights under the Fifth Amendment to the United States Constitution.

48. In addition, the Bureau's stated intention to assess and charge Westlands, San Benito, San Luis, and Panoche restoration payments pursuant to section 3407(c) of PL 102–575 impairs each party's vested rights under their respective water service contract in violation of the due process clause of the Fifth Amendment to the United States Constitution.

These allegations, taken as true, are sufficient to give notice that the methods of CVPIA implementation are challenged as arbitrary, capricious and/or contrary to law, resulting in a due process deprivation of vested contract rights. No due process claim as to the procedural or substantive validity of the CVPIA or ESA, as enacted, is raised by Westlands or any other plaintiff; except a challenge to the restoration assessments under CVPIA § 3407(c), which was not addressed in the *Barcellos* post-judgment orders. That claim is not precluded, and is adequately alleged as a due process impairment of vested contract rights.

The motion to dismiss Westlands' first claim, on the grounds of claim or issue preclusion, is denied, except for the issue of whether the Westlands and related parties' water rights were absolutely unalterable under their contracts with the Bureau as to which the motion is granted.

### Area I's Complaint

Paragraph 35 alleges:

(e) The Federal Defendants' failure and refusal to sell and deliver water is neither mandated nor permitted under the ESA.

(f) The Federal Defendants' failure and refusal to sell and deliver water is neither mandated nor permitted under the CVPIA.

(g) The Federal Defendants' failure and refusal to sell and deliver water is a violation of the CVPIA §§ 3408(k), 3409 and 3411(a).

(h) The Federal Defendants' failure and refusal to sell and deliver water was not done in compliance with the ESA or CVPIA.

Taken as true, these allegations provide the defendants notice of claims their actions in allocating CVP water are arbitrary, capricious and/or contrary to law. That issue was not determined in *Barcellos* and is not precluded. Resolution of these claims requires interpretation of contracts and the determination of factual issues concerning the Bureau's compliance with the CVPIA and ESA, which cannot be decided on a motion to dismiss.

### Other Parties' Complaints

No other plaintiff was either a party, nor in privity with a party in *Barcellos*. Their complaints concerning different contracts are not precluded by *Barcellos*.

---

5. Court records indicate that one order on the post-judgment motions is on appeal. This does not change the result. "[I]n federal courts, the preclusive effects of a lower court judgment cannot be suspended simply by taking an appeal that remains undecided." *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir.1988) (*quoting* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4435 (1981)).

### Merits of the Constitutional Claims

### Due Process

### Government Contract Interpretation: Background

■ In *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934), the Supreme Court held "[r]ights against the United States arising out of a contract with it" are property rights protected from deprivation or impairment by the Fifth Amendment Due Process Clause." [6] Under that protection, sovereign authority cannot be exercised to invalidate, release or extinguish contractual rights, or by acts "which without destroying [the] contracts derogate[s] from substantial contractual rights." *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 279, 89 S.Ct. 518, 524, 21 L.Ed.2d 474 (1969). A Due Process violation requires: 1) cognizable property rights arising out of a contract with the government; and 2) that the government has abrogated those contractual rights. *Madera Irrigation District v. Hancock*, 985 F.2d 1397, 1401 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993); *Barcellos and Wolfsen, Inc. v. Westlands Water District*, 899 F.2d 814, 821 (9th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990).

■ Federal law controls the interpretation of a contract made under federal law when the United States is a party. *U.S. v. Seckinger*, 397 U.S. 203, 209–210, 90 S.Ct. 880, 884–85, 25 L.Ed.2d 224 (1970). Principles of government contract interpretation:

.... compel a construction somewhat more liberal toward the government than might be appropriate were the contract a purely private transaction. They enable it to change, not just execute past policies. But too liberal an interpretation of the residual sovereign power of the government to override its contractual commitments would eviscerate the government's power to bind itself to contracts. In addi-

tion to the moral offensiveness of allowing the government to break its promises, too liberal a construction would have the paradoxical consequence of weakening the sovereign power to implement policy.

*Madera Irrig. Dist.*, 985 F.2d at 1401. The plaintiffs argue that *Seckinger*, 397 U.S. at 216, 90 S.Ct. at 888, requires that where the federal government drafts the contract, "provision[s] should be construed less favorably to that party which selected the contractual language"—that is, the federal government. But the issue presented in *Seckinger* was not abrogation of sovereign power to enact subsequent legislation; it was interpretation of an indemnity provision. *Id.* at 204, 90 S.Ct. at 881. As noted in *Western Fuels–Utah, Inc. v. Lujan*, 895 F.2d 780, 789 (D.C.Cir.), *cert. denied* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990), courts have adopted specific rules to determine if a contract right is immune from future changes in the law.

■ The rules of government contract interpretation for immunity from future legislation are as follows: First, invalidation of subsequent legislation under the Due Process clause is to be avoided; government contracts should be construed "to avoid foreclosing the exercise of sovereign authority." *Peterson v. United States Dept. of the Interior*, 899 F.2d 799, 807 (9th Cir.), *cert. denied* 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). Legislation must be construed in a constitutional manner "if fairly possible." *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir.) (*quoting Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932), *cert. denied*, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982).

■ Second, "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." *Peterson*, 899 F.2d at 807.

---

6. The fifth amendment's prohibition against impairment of contractual rights generally subjects federal action to a "less searching standard" than the prohibition on state interference with contractual rights within the Contract Clause, article I, § 10. *See, Pension Benefit Guaranty Corp. v. R.A. Gray & Company*, 467 U.S. 717, 733, 104 S.Ct. 2709, 2719–20, 81 L.Ed.2d 601 (1984).

Third, "[s]overeign power 'will remain intact unless surrendered in *unmistakable terms.*'" *Madera Irrig. Dist.*, 985 F.2d at 1401, (emphasis added), (*quoting Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2396, 91 L.Ed.2d 35 (1986) ("*Bowen*"). The "unmistakable terms" requirement is based on the principle that under the usual rule, "contractual arrangements, including those to which a sovereign itself is a party, remain subject to subsequent legislation by the sovereign." *Peterson*, 899 F.2d at 807, *quoting Bowen*, 477 U.S. at 52, 106 S.Ct. at 2397. The doctrine originated in *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 561, 7 L.Ed. 939 (1830), where Chief Justice Marshall wrote, "[B]ut as the whole community is interested in retaining [the sovereign power] undiminished; that community has a right to insist, that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear." Relying on *Billings* and its progeny, the Supreme Court has often applied its rule of construction that "nothing passes but what has been granted in clear and explicit terms; and that neither the right of taxation, nor any other power of sovereignty, will be held by this court to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken." *Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446, 17 L.Ed. 173 (1862); *see also Bowen*, 477 U.S. at 52–53, 106 S.Ct. at 2396–97; *Merrion v. Jicarilla Appache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982).

The Supreme Court has applied the "unmistakable terms" requirement less forcefully in cases where the government enacts legislation to ease its financial burdens, in contrast to those in which the government implements social policy. *Compare Lynch v. United States*, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934) (enforcing agency's promise to provide life insurance policies to individuals who paid premiums after Congress canceled program to "lessen government expenditure"); *with Bowen*, 477 U.S. at 53, 106 S.Ct. at 2397 (That contracts be construed to avoid the exercise of sovereign power "take[s] on added force when the arrangement pursuant to which the Government is claimed to have surrendered a sovereign power is one that serves to implement a comprehensive social welfare program affecting millions of individuals throughout our Nation.").

Where the party to a government contract is an agency, the "unmistakable terms" requirement is complicated by separation of powers concerns. Neither the Supreme Court nor the Ninth Circuit has answered the question of whether an agency can immunize a party against Congress' power to legislate. *But see Madera Irrig. ·Dist.*, 985 F.2d at 1407 (Hall, J., concurring) ("It is doubtful that the Secretary of the Interior could, by contract, waive the right of Congress to pass laws"). *Transohio Savings Bank v. Director, Office of the Thrift Supervision*, 967 F.2d 598, 621 (D.C.Cir.1992), held that an agency is without power to cede by contract, Congress' legislative power, unless Congress has delegated that authority to the agency in "unmistakable terms." [7] The court reiterated two long-standing principles of agency law: First, "It is 'central to the real meaning of the 'rule of law,' [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so." *Transohio Savings*, 967 F.2d at 621 (*quoting* Edward L. Rubin, *Law and Legislation in the Administrative State*, 89 Colum.L.Rev. 369, 402 (1989)).

Second, agency actions beyond delegated authority are *ultra vires* and must be invalidated by a reviewing court. *Id.* "Anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Id.* at 623 (*quoting Federal*

---

**7.** *Transohio Savings* did not reach the question of whether an unmistakable delegation was constitutionally permissible, noting that where "the Supreme Court [has] found a valid contract surrendering Congress' legislative power, the Court made clear that *Congress had explicitly autho-* *rized the contract.*" *Id.*, 967 F.2d at 622 (emphasis added) (*citing, Perry v. United States*, 294 U.S. 330, 348, 55 S.Ct. 432, 434, 79 L.Ed. 912 (1935)); *see also Lynch*, 292 U.S. at 576, 54 S.Ct. at 842 (property right existed in insurance policies issued pursuant to congressional legislation).

*Crop Ins. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). The court observed that, according to *Peterson*, 899 F.2d at 808, "In light of the fundamental principle that Congress always has the power to amend, repeal or ignore legislation passed by earlier congresses, we decline to ... require that Congress expressly recite that it reserves the right to 'repeal, amend or alter' legislation to preserve its fundamental right to do so." *Transohio Savings* also holds:

> In the context of contracts entered into by administrative agencies, ... the unmistakability doctrine has two components: the contract relinquishes Congress' power to regulate only when: 1) the agency, in the contract, has unmistakably waived Congress' regulatory authority, and 2) Congress, in a statute, has unmistakably delegated to the agency the power to surrender Congress' regulatory authority.

*Id.*, 967 F.2d at 621.

The government agency to the disputed water contracts, the Secretary of the Interior, by the Bureau of Reclamation, has been delegated authority by Congress in the Act of June 17, 1902, ch. 1093, 32 Stat. 388 and Act Aug. 13, 1914 ch. 247, 38 Stat. 686, classified generally as 43 U.S.C. § 372 *et seq.*

43 U.S.C. § 373 provides:

> The Secretary of the Interior is hereby authorized to perform any and all acts and to make rules and regulations as may be necessary and proper for the purpose of carrying the provisions of this Act into full force and effect.

43 U.S.C. § 375f states:

> The Secretary of the Interior is authorized to perform any and all acts and to make rules and regulations necessary and proper for carrying out the purposes of this Act.

43 U.S.C. § 423e states in relevant part:

> ... The Secretary of the Interior is authorized in his discretion to enter into agreement with the proper authority of the State or States wherein [water] projects or divisions are located ...

16 U.S.C. § 590z–11 states:

> For the purpose of facilitating and simplifying the administration of the Federal reclamation laws ... the Secretary of the Interior is hereby authorized to delegate, from time to time and to the extent under such regulations as he deems proper, his powers and duties under said laws to the Commissioner of Reclamation, an Assistant Commissioner, or the officer in charge of any office, division, district, or project of the Bureau of Reclamation.

This language chosen by Congress does not include an unmistakable delegation of the power to surrender Congress' regulatory authority to enact future legislation. No party has pointed to other statutory language that is an unmistakable waiver of Congress' sovereign authority to repeal, amend, or alter legislation applicable to the Bureau.

The nature of the environmental legislation in dispute, the CVPIA, directly implicates broad questions of social policy. The CVPIA also seeks to ease federal financial burdens by shifting more costs of CVP water and its management and delivery to CVP contractors. *See* Central Valley Project Reform Act, H.R.Rep. No. 576, Pt. 1, 102d Cong.2d Sess. at 35 (June 16, 1992) ("House Report"); 138 Cong.Rec. § 17658, 17662 (daily ed. Oct. 8, 1992). Congress has apparently shifted priority from continued development to agricultural use of lands without natural water supplies, through the availability of federal project subsidized water, to curtailing the availability of federal project water for agricultural use to serve environmental purposes. *See* House Report, at 35. This necessarily leads to an analysis of the contracts to determine if the agency, expressly waived the sovereign power to regulate and if the parties allocated the risk of and liability for a change in federal water delivery priorities.

Where damages for breach of contract are sought, the analysis may differ. In *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953 (Fed.Cir.1993), the court found that a government contract between a satellite manufacturer and the NASA, for the launch of commercial payloads, shifted responsibility to the government, absent other defenses, for cost of changes in launch priority and scheduling, even if caused by sovereign government action. Article IV of that contract required the government to sched-

ule launch services according to "the United States policy governing launch assistance approved by the President of the United States on August 6, 1982." *Hughes Communications,* 998 F.2d at 957. After the contract was signed, the President ordered NASA to stop launching commercial spacecraft. The court held that Article IV language "more than satisfies the 'unmistakable terms' requirement," for surrender by the government of its authority to act as sovereign, rejecting the government's argument that this reading "would have the effect of allowing NASA to contract away Congressional and Presidential power to set space policy for the entire term of the [contract]." *Id.* at 958. The court distinguished *Bowen* and *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), stating:

> "The present case simply involves the question of how liability for certain contingencies was allocated by the contract.... Our conclusion does not prevent the President or Congress from implementing space policy, but does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from revised policy."

*Id.* 998 F.2d at 958–59. For that reason, NASA could be liable for damages for breach of the launch contract.

### The Law Applied

 The due process analysis first inquires whether the plaintiffs have cognizable property rights in the water contracts. *Madera Irrig. Dist.,* 985 F.2d at 1401. Where the rights conferred in an agreement are entered "in conformity with" legislation, conferring rights coextensive with that legislation, the agreement remains subject to the legislature's express or implied power to amend that agreement, and no protectible property interest exists apart from that conferred by statute. *Bowen,* 477 U.S. at 53–55, 106 S.Ct. at 2397–2398; *Peterson,* 899 F.2d at 808. A contract executed within the agency's authority and supported by independent consideration is protected by the fifth amendment. *Lynch,* 292 U.S. at 576, 54 S.Ct. at 842; *Madera Irrig. Dist.,* 985 F.2d at 1402. Furthermore, "the government cannot re-

serve to itself an unlimited right to escape its contractual obligations 'without rendering its promises illusory and the contract void.'" *Madera Irrig. Dist.,* 985 F.2d at 1405, (*citing Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 760 (1982)). Here, the Bureau made long term contracts with plaintiffs under a Congressional grant of authority to appropriate, allocate, manage and deliver federal water through the CVP.

 The Due Process analysis next asks whether the vested contract right has been abrogated; traditionally measured by the following standard: "The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them and ... [by laws] which without destroying contracts derogate from substantial contractual rights." *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 431, 54 S.Ct. 231, 237, 78 L.Ed. 413 (1934). The abrogation of a vested right must be substantial. *Barcellos and Wolfsen,* 899 F.2d at 821 ("If no substantial impairment is shown, the inquiry ends."). The plaintiffs' complaints allege the value of water and the draconian effects a reduction of their water allocations will have. Reduction of water allocations from 50%, or in the case of the Stockton plaintiffs, 100%, of contractual water entitlements, meets the substantial impairment requirement.

The Federal Defendants argue that evidence that the parties contemplated the contracts were subject to subsequent legislation is found in the contract preambles. The Stockton parties' contracts begin:

> THIS CONTRACT, made this 19th day of December, 1983, *in pursuance generally of the Act of June 17, 1902 (32 Stat. 388),* and acts amendatory or supplementary thereto.... WITNESSETH, That: ...

The San Benito, San Luis and Panoche contracts contain substantially similar language. The CVPIA states that it was enacted as an amendment to federal reclamation law. The plaintiffs dispute the Federal Defendants' reading of the contracts' preambles.

 It cannot be said as a matter of law that the phrase "in pursuance generally" reserves the unconditional right to enact subse-

quent legislation, which renders the contract entirely without value under all circumstances. As a general rule, although a preamble may be useful in interpreting an ambiguous operative clause in a contract, "it cannot create any right beyond those arising from the operative terms of the document." *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir.1985) (citing cases); 17A Am. Jur.2d Contracts § 392 at 417–18 (1991) (recitals indicate only the background of the contract, "they do not ordinarily form any part of the real agreement").

■ The interpretation offered by the government would amount to a reservation of "an unlimited right to escape its contractual obligations," a disfavored construction which renders the government's promises "illusory and the contract void.'" *Madera Irrig. Dist.*, 985 F.2d at 1405. It would render superfluous the contract provisions requiring the Bureau not to use means within its control to create water shortages. A contract should be interpreted in such a way that all its parts make sense. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir.1983). The motion to dismiss cannot be granted based on an interpretation as a matter of law that preamble language waives a due process property interest in water against any and all subsequent legislation, without taking evidence of the intent of the contracting parties.

Plaintiffs argue that their water contracts contain an "unmistakable waiver" of sovereign authority. The San Benito contract provides, at ¶ 27, in relevant part:

> ... [I]n the event that the Congress amends the excess-lands provisions or other provisions of the Federal reclamation laws, the United States agrees, at the option of the Contractor, to negotiate amendments of the appropriate articles of this contract, *all consistent with* the provisions of such amendment. (Emphasis added)

The Panoche and San Luis Districts' contracts contain a substantially similar provision at ¶ 23. In *Peterson*, 899 F.2d at 812, the Ninth Circuit construed almost identical language, and rejected the argument that this provision waived sovereign authority to legislate, stating,

> We believe that a more reasonable interpretation of [this provision] is that it grants the Water Districts the option of renegotiating the terms of their contracts to conform to Congress's amendments to the [amended] provisions of reclamation law. This option does not, however, give the Water Districts the right to continue to receive reclamation water under the terms of the pre-existing contracts if those terms violate the newly amended law.

Although the water districts assert that the *Peterson* analysis is merely *dicta*, that court stated that this analysis was an alternative reason to support its *holding*. The key language is the phrase, "all consistently with," which specifies that amendments to existing water contracts are to be consistent with any amendments to reclamation law. Even if the *Peterson* analysis is *dicta* the renegotiation provision does not unmistakably waive the Bureau's right to act pursuant to subsequent valid legislation. To the contrary, renegotiation is to conform the contracts to subsequent amendments to reclamation law. This supports the position that the government reserved the authority to legislate about CVP water.

San Benito, San Luis, and Panoche argue that "unmistakable waivers" exist in each of their contracts.

The San Benito contract states:

> ¶ 7(a): In its operation of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor to this Contract. Nevertheless, if a shortage does occur during any year because of drought, or other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States, no liability shall accrue against the United States, or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

The San Luis contract and Panoche contract both contain the following identical provisions:

> ¶ 18(e): The United States agrees that it will not voluntarily and knowingly, by exe-

cution of new contracts establishing additional long-term contractual commitments for water from the Sacramento–San Joaquin Delta *or otherwise*, do anything which would limit its ability to deliver water that is *available to it* from the Sacramento–San Joaquin Delta to the Contractor and others presently entitled thereto. (Emphasis added.)

This language gives rise to the contention that these parties intended to allocate liability for a government controlled shortage of water, without creating a specifically enforceable right in plaintiffs to compel water deliveries from the Bureau.

Stockton East has a contract for an interim supply of water from the New Melones Dam; Central San Joaquin has a contract for both an interim and firm supply of water from the same facility. Both contracts contain the following provision:

> 9.(a) In its operation of the Project, the United States will use all reasonable means to guard against a condition of shortage in the quantity of water available to the Contractor pursuant to this contract. Nevertheless, *if a shortage does occur* during any year *because of* drought, or *other causes which, in the opinion of the Contracting Officer, are beyond the control of the United States,* no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom. (Emphasis added.)

The plaintiffs argue that these sections constitute the United States' promise to use all reasonable means to guard against shortage, including refraining from enacting legislation (a cause within the government's control) that impairs the government's duty to deliver water under the contracts. The San Luis, San Benito and Panoche districts argue in the alternative that, when read in conjunction with other contract provisions, the "beyond the control" provision should be read to preclude reductions in the water supply for any reason unrelated to water quality.

There are several plausible interpretations of these contract provisions: First, the phrase could require the United States, including Congress, to "use all reasonable means" to refrain from enacting legislation that interferes with the districts' contract rights. This interpretation assumes that enacting legislation is not a cause "beyond the control" of the United States, and that the Bureau had the authority to cede that right by contract.[8] Under this reading, the United States would not be excused from performance or damages for breach under the "no liability shall accrue" provision, because enactment of legislation was either within its control, and/or the United States was or should have been aware of existing statutory and contractual obligations under the disputed contracts. Unlike the "any cause" provision discussed in the orders in the *Barcellos* post-judgment motions, these provisions impose affirmative obligations on the United States not to create any shortages.

Second, the provision could be read to waive the Bureau's authority to act pursuant to valid legislation in a manner which contravenes the water districts' rights to receive contractual allotments of water. This interpretation assumes that the Bureau was fully aware of all legal obligations when it undertook its contractual obligation to supply water, and should have anticipated that subsequent legislation may be enacted. Under this reading, the Bureau would be obligated to refrain from taking actions to create water shortages, or be liable if its failure to supply water was due to its obligation to comply with later legislation.

Third, as San Benito, San Luis and Panoche argue, the contracts can be read as a whole to excuse performance where "water quality" or "water pollution" are causes of shortage. The San Luis and Panoche contracts state at ¶ 29:

> The Contractor shall, within its legal authority, comply with all applicable Federal laws, orders and regulations, and the laws of the State of California, all as administered by appropriate authorities, concern-

---

8. Similarly, under the language used within the San Benito and Panoche contracts, the United States could have agreed to refrain from "doing anything which would limit its ability to deliver water to the contractors," including enactment of legislation.

ing protection of the environment and pollution of air, streams, reservoirs, groundwater, or water courses *with respect to thermal pollution or the discharge of refuse, garbage, sewage effluent, industrial waste, oil, mine tailings, mineral salts, or other pollutants.*

The San Benito contract states, at ¶ 7(c):

If operation of the Project to meet legally required *Delta water quality control standards, including Federally adopted water quality standards,* causes a shortage in water supply and requires a reduction in deliveries of water to the Contractor under this agreement, such reductions will be made in accordance with subdivision (b) of this article and shall not be deemed a breach thereof.

Read in their entirety, these contracts could excuse the Bureau's performance only for changes in water quality control standards. This interpretation assumes the Bureau was aware of environmental concerns when contracting, yet chose to limit excuses for performance to those listed. Where specific and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language. *Hughes Communications, supra,* 998 F.2d at 958.

Fourth, the provisions can be read to require the Bureau to use its best efforts to provide water under the contracts, subject to limitations of water availability and any changes caused by subsequent legislation. Under this interpretation, the Bureau avoids liability for water shortages caused by subsequent valid legislation.

These various contractual provisions of plaintiffs' contracts are susceptible of more than one reasonable interpretation and are therefore ambiguous. *See Castenda v. Dura–Vent Corp.,* 648 F.2d 612, 619 (9th Cir.1981). A motion to dismiss cannot be granted against a complaint to enforce an ambiguous contract. *Consul Ltd. v. Solide Enterprises, Inc.,* 802 F.2d 1143, 1149 (9th Cir.1986).

Evidence as to the contracting parties' intent and the circumstances under which they contracted is required to determine waiver of the sovereign power to act. "The sovereign act defense is an inherent element of every contract to which the government is a party, whether or not explicitly stated." *Hughes Communications Galaxy, Inc. v. U.S., supra,* 998 F.2d at 958.

The parties must be given an opportunity to fully develop the background, intent, and meaning of the disputed contracts, as the language chosen does not express allocation of risk in unambiguous terms. The motions to dismiss the due process claims must be denied, because the government's excuse from performance without liability is not established as a matter of law by the contracts' language.

**Assessments**

 Westlands and Area I allege due process violations for the imposition of restoration payment assessments, under CVPIA § 3407(c). That section provides, in relevant part:

(1) To the extent required in appropriation acts, the Secretary shall assess and collect annual mitigation and restoration payments, ... consisting of charges to direct beneficiaries of the Central Valley Project under subsection (d) of this section in order to recover a portion of all of the costs of fish, wildlife, and habitat restoration programs and projects under this title....

It is claimed the assessment violates the express terms of article 6(a) of the Westlands contract, as enforced by the 1986 *Barcellos* judgment. They argue that section 3408(k) [9] prevents application of the CVPIA to the *Barcellos* settlement agreement and judgment. It is suggested there is no rational relationship between any burden caused by or benefit received from the assessments. The disputed Article in the Westlands Water Service Contract states, in relevant part,

6. (a) Before December 15 of each year the Contracting Officer shall notify the District in writing of the rate of payment

---

9. That section provides:

Except as specifically provided in this title, nothing in this title is intended to alter the terms

of any final judicial decree confirming or determining water rights.

to be made by the District for water which the District is required to accept and pay for during the ensuing year pursuant to the provisions of Article 3 hereof. *The rate so announced may not be in excess of Eight Dollars ($8) per acre-foot....*

Despite Area I's attempts to distinguish its facts, the reasoning of *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) is controlling. In *Merrion,* the Court held that an Indian tribe had the power to tax oil and gas production by entities leasing tribal land. The leases provided rents at the specific rate of $1.25 per acre, and a royalty of 12½% of the value of all oil and gas produced from the leased land. The Court held at 455 U.S. at 147–48, 102 S.Ct. at 907:

> ... [T]he absence of a reference to the tax in the leases themselves hardly impairs the Tribe's authority to impose the tax. Contractual arrangements remain subject to subsequent legislation by the presiding sovereign. *Veix. v. Sixth Ward Building and Loan Assn. of Newark,* 310 U.S. 32[, 60 S.Ct. 792, 84 L.Ed. 1061] (1940) and *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398[, 54 S.Ct. 231, 78 L.Ed. 413] (1934). Even where the contract at issue requires payment of a royalty for a license or franchise issued by the governmental entity, the government's power to tax remains unless it "has been specifically surrendered in terms which admit of no other reasonable interpretation." *St. Louis Railroad v. United R. Co.,* 210 U.S. 266, 280[, 28 S.Ct. 630, 634, 52 L.Ed. 1054] (1908).

Under *Merrion,* the existence of fixed rates in a contract did not unmistakably waive the sovereign's authority to impose additional charges. Additionally, the "not to exceed" provision cited by Area I is identical to a term, which purported to cap water rates in the *Madera Irrig. Dist.* case. *Id.,* 985 F.2d at 1407; in which the concurrence expressed doubt the Secretary by such language unmistakably surrendered Congress' rights to enact legislation. *Id.; see also Transohio Savings,* 967 F.2d at 621. The contract preamble is sufficient to raise the

issue of notice that the contract was part of a larger legislative scheme:

Section 3408(k) prohibits the alteration of judicial decrees only if the subject is not *"specifically provided in this title."* The disputed assessments *are* specifically provided for in CVPIA § 3407(c). Such assessments, although the subject of a prior judicial decree, are therefor not precluded from alteration by the CVPIA.

As to the claim that the assessments provision is substantively invalid, Congress has determined that the CVPIA was necessary to alleviate the effects of the "profound" burden that the CVP took, and continues to take, on fish and wildlife habitats. *See* House Report, at 17–19. Congress may rationally conclude that increased assessments are appropriate to remediate the burden on the environment imposed by the CVP and its water users. *See Madera Irrig. Dist.,* 985 F.2d at 1405. That determination is articulated in CVPIA legislative history.

There appears to be no set of circumstances under which plaintiffs can, under the law, claim a compensable property interest in freedom from increased assessments. Westlands asserted it can state such a claim, the motions to dismiss the due process claims for unlawful assessments is granted, with ten days leave to amend.

### Fifth Amendment "Takings Claim"—Jurisdiction

Westlands, Area I and the Stockton East plaintiffs allege that the Bureau's operation of the CVP for fishery and related environmental purposes constitutes a taking, entitling those parties to just compensation under the Fifth Amendment. Although Westlands seeks to rely on the property interests arising from the water contracts as the basis for its claims, Area I also asserts that land value was impaired by the regulatory activity of the federal government.

■ The Federal Defendants challenge jurisdiction under the Tucker Act, 28 U.S.C. §§ 1346(a)(2) & 1491(a)(1). "The Tucker Act is both a waiver of sovereign immunity and a grant of exclusive jurisdiction to the Court of Claims to decide monetary claims in excess of $10,000 against the United States [or its

agencies] founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States.'" *Bedoni v. Navajo–Hopi Indian Relocation Commission,* 854 F.2d 321, 325 (9th Cir.1988); *Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* 823 F.Supp. 715 (E.D.Cal.1993). . The Tucker Act does not preclude review of agency action for injunctive or declaratory relief, but a "district court is prohibited from evading the preclusive effect of the Tucker Act or infringing upon the exclusive province of the Court of Claims by issuing injunctions or declaring judgments which are designed to serve as res judicata in the Court of Claims to affect a monetary recovery in a subsequent suit." *Bedoni,* 854 F.2d at 325; *McKeel v. Islamic Republic of Iran,* 722 F.2d 582, 590–91 (9th Cir.1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).

■■■ The Westlands plaintiffs assert that jurisdiction may be premised on 43 U.S.C. § 390uu, which provides:

> Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law. The United States, when a party to any suit, shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty, and shall be subject to judgements, orders and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances. Any suit pursuant to this section may be brought in any United States district court in the State in which the land involved is situated.

This contention has been decided in an almost identical context in *Sumner Peck,* which concluded:

> This Court lacks jurisdiction to consider a takings claim. . . . Section 390uu does not provide jurisdiction. It governs disputes regarding contractual rights arising from Reclamation law. The right to just com-

pensation is a constitutional claim, not a contractual one. The existence of disputed contracts does not bring this claim within the scope of waiver of immunity provided by Section 390uu.

*Sumner Peck,* 823 F.Supp. at 749.

The Westlands plaintiffs attempt to distinguish the instant dispute, stating "the Districts' just compensation claim is based on a property interest arising out of the water service contracts themselves, which were entered into pursuant to reclamation law. Therefore, the claim falls within section 390uu's provision to 'adjudicate . . . the contractual rights of a contracting entity and the United States.'" The plaintiffs point out that *Sumner Peck* determined: "Section 390uu authorizes a district court to hear a contract claim arising under reclamation law. Its language is broad enough to provide for the award of money damages." *Id.,* 823 F.Supp. at 746.

The Supreme Court has reiterated:

> If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking. For this reason, takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act. . . . The proper inquiry is not whether the statute expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy, but rather *whether Congress has withdrawn the Tucker Act grant of jurisdiction to the Claims Court to hear a suit involving the statute founded upon the Constitution.*

*Preseault v. I.C.C.,* 494 U.S. 1, 10–12, 110 S.Ct. 914, 921–22, 108 L.Ed.2d 1 (1990) (emphasis added). To meet this standard, 390uu must exhibit the "unambiguous intention to withdraw the Tucker Act remedy." *Id.* 494 U.S. at 12, 110 S.Ct. at 922. Section 390uu provides for suit in district court to adjudicate "the *contractual rights* of a contracting entity." In the final analysis, the takings claims asserted in the complaint allege the

right to just compensation under the Fifth Amendment for a taking of property for a public purpose, a *constitutional not contractual right.* Section 390uu expresses no "unambiguous intention to withdraw the Tucker Act remedy" for adjudication of a takings claim. *Preseault,* 494 U.S. at 12, 110 S.Ct. at 922. The takings claim is "founded upon the Constitution" and therefore within the exclusive jurisdiction of the Tucker Act, unless the compensation sought is less than $10,000. *See also Ruckelshaus v. Monsanto, Co.,* 467 U.S. 986, 1020, 104 S.Ct. 2862, 2882, 81 L.Ed.2d 815 (1984) ("Once a taking has occurred, the proper forum for [plaintiff]'s claim is the Claims Court.").

The motions to dismiss the plaintiffs' takings claims are granted with leave to amend, only if plaintiffs can allege that damages sought are less than $10,000, to invoke the court's concurrent jurisdiction. Otherwise, plaintiffs' takings claims belong in the Court of Claims.

**NEPA Claims**

### Standing

Movant's initially attack plaintiffs' NEPA claims for lack of standing, arguing that, because the complaints allege injuries outside the zone of interests protected by NEPA, only economic injury, plaintiffs cannot meet the prudential standing requirements under section 10 of the APA.

In addition to the constitutional "case or controversy" standing requirements of Article III,[10] a plaintiff must establish NEPA standing. NEPA does not provide for a private cause of action; plaintiff must proceed under the APA which in § 702 permits suit to be brought by "any person adversely affected or aggrieved by agency action within the meaning of the relevant statute." This section has been interpreted to require NEPA plaintiffs to fall within the "zone of interests" of NEPA to assert their claims. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–84, 110 S.Ct. 3177, 3186–87, 111 L.Ed.2d 695 (1990). If a plaintiff satisfies the "zone of interests" test, "it

will necessarily have satisfied the constitutional injury requirement as well." *City of Los Angeles v. National Highway Safety Admin.,* 912 F.2d 478, 483 (D.C.Cir.1990). The purpose of the "zone of interests" test is to "exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives. *Nevada Lands Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 716 (9th Cir.1993).

NEPA's legislative purpose is:

To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation, . . .

42 U.S.C. § 4321. The Ninth Circuit interprets NEPA as an essentially procedural statute, that requires federal agencies to follow a procedure—e.g., preparing and considering an EIS—whenever the proposed action may significantly affect the quality of the human environment. *See* 42 U.S.C. § 4332(C); *Davis v. Coleman,* 521 F.2d 661, 670 (9th Cir.1975). An agency's failure to prepare an EIS may mean the loss of the last opportunity to eliminate serious, but nonobvious, environmental impacts of a project in accordance with these NEPA objectives. *Davis,* 521 F.2d at 670. "[T]he creation of a risk that serious environmental impacts will be overlooked" is sufficient to establish the injury necessary for standing, "provided this injury is alleged by a plaintiff that . . . . may be expected to suffer whatever environmental consequences the [decision] may have." *Davis,* 521 F.2d at 671. Purely economic injury is insufficient. *Port of Astoria v. Hodel,* 595 F.2d 467, 475 (9th Cir.1979). But the presence of economic injury, if the plaintiff also asserts environmental concerns, does not preclude standing. *Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C.Cir.1977).

---

10. Plaintiffs must allege: 1) particularized injury; 2) concrete and demonstrable injury that results from the defendant's actions; and 3) that the injury will be redressed by the remedy sought. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ An issue exists whether standing need be established by any plaintiff other than Westlands. In the Ninth Circuit, where a plaintiff with standing prosecutes an action, intervenors are not required to meet either Article III or NEPA's standing requirements.[11] *Portland Audubon Soc. v. Hodel,* 866 F.2d 302, 308 n. 1 (9th Cir.1989); *see also Didrickson v. U.S. Dept. of the Interior,* 982 F.2d 1332, 1340 (9th Cir.1992); *Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (declining to resolve inter-circuit split on whether intervenor must satisfy Art. III). That intervenors meet the test for intervention under Federal Rule of Civil Procedure 24 appears sufficient to justify their participation in the suit.

■ The plaintiff bears the burden of establishing standing. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——–——, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1986). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, [a court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* —— U.S. at ——, 112 S.Ct. at 2137. The Westlands complaint states:

¶ 53: The Bureau's reduction of water supplies to Westlands, San Benito, San Luis, and Panoche will significantly affect the quality of the human environment. Among the effects of such reduced deliveries will be increased reliance on groundwater for irrigation, resulting in a severe decline in the groundwater level and also in land subsidence. For example, much of the groundwater underlying Westlands is of a quality that makes it unsuitable for irrigation, and such water must be carefully blended with higher quality surface water so that the resulting irrigation water will not be detrimental to crop production or to the soil to which it is applied. If higher quality surface water is not available from the Bureau, growers in Westlands will rely instead on poorer quality groundwater which will result in reduced crop yields and excessive salt buildup in the crop root zone within Westlands. In addition, to the extent that groundwater cannot replace water supply reductions from the Bureau or to the extent that salt buildup as a result of groundwater use reduces the productivity of croplands, prime agricultural land will be permanently fallowed. These fallowed lands will be subject to wind erosion causing severe dust problems in the Westlands area.

Facts alleged describe injuries to: 1) the groundwater quality and supply; 2) crop production; 3) soil quality of land to which groundwater is applied; 4) the Westlands area, due to dust from fallowed land. These facts describe more than economic injury. Although a reduction in the groundwater supply has an undeniable economic effect, the facts alleged, taken as true, describe significant adverse environmental effects.

The decisions cited by the Defendants are distinguishable. In *Trinity County Concerned Citizens v. Babbitt,* CV–92–1194 (D.C. Sep. 22, 1993), the court found that the plaintiff's assertions that designation of a forest area as a critical habitat would render the forest more susceptible to fire was insufficient to establish standing. This allegation of injury was "entirely speculative," and the "plaintiff's attempt to articulate concern for the health of the forest is in fact no more than an economic injury in disguise." Although the plaintiffs' admit some economic impetus for bringing suit, that circumstance does not bar NEPA standing. *Realty Income Trust,* 564 F.2d at 452. Nothing in the complaints demonstrates the plaintiffs' allegations are a pretext to redress purely economic concerns.

*Mountain States Legal Foundation v. Madigan* CV–92–0097 (May 7, 1992) is also distinguishable. There, the court found the plaintiff's attempt to redefine "environment" as preserving plaintiff's own ability to earn a living was insufficient to establish standing. The court stated, "though plaintiffs sometimes make a point of alleging concern for the health of the forest, the only manner in which they are claiming injury to themselves is by the decreased timber harvesting." In contrast, the *Westlands* complaint alleges a

---

11. No party has raised this issue.

concern for the preservation of the groundwater supply, water quality, air quality, and the long-term adverse effects on the soil. These interests do not frustrate NEPA's broad concerns for the environment as a whole: Taking the complaints' allegations as true, if plaintiffs are successful in obtaining an injunction directing the preparation of an EIS, it is consistent with NEPA to take advantage of this last opportunity to eliminate serious, but nonobvious, environmental impacts before the CVPIA is implemented. *Davis*, 521 F.2d at 670.

### Local Agency Standing

Movants argue the Westlands plaintiffs are not the proper parties to assert a NEPA claim because, as water districts, they cannot establish standing for their own injury under *Port of Astoria*, 595 F.2d at 475. *Port of Astoria* considered whether a port district had NEPA standing pursuant to 42 U.S.C. § 4332(2)(C).[12] That section requires federal agencies to obtain the comments of "local agencies" that are authorized "to develop and enforce environmental standards." The following legislative history:

> With regard to State and Local agencies, it is not the intention of the conferees that those Local agencies with only a remote interest and which are not primarily responsible for development and enforcement of environmental standards be included.

H.R.Rep. No. 91–765, 91st Cong., 1st Sess. at 8, *reprinted in* 1969 U.S.S.C.N. 2751, 2767, 2769; establishes Congressional intent to support the finding that although agencies that are *primarily* responsible for the development and enforcement of environmental standards can sue to enforce their procedural "right to be heard," the port agency could not because it was merely authorized to "make, establish, change, modify, or abolish regulations on stream pollution" and was not

a local agency primarily responsible for the development and enforcement of environmental standards. *Id.* at 475. *Compare Davis*, 521 F.2d at 675 (City was within the zone of protected interests of NEPA because it had *primary responsibility* for promulgation and enforcement of local environmental regulations).

■ The Westlands plaintiffs assert as evidence of their ability to promulgate and enforce environmental regulations, the following provisions of the California Water Code:

§ 10753:

(a) Any local agency, whose service area contains a groundwater basin, or a portion of a groundwater basin ... may ... adopt and implement a groundwater management plan pursuant to this part within all or a portion of its service area.

§ 10752 defines "any local agency" as:

(g) .... any local public agency that provides water service to all or a portion of its service area.

§ 10752 defines a "groundwater management plan" as:

(e) .... a coordinated and ongoing activity undertaken for the benefit of a groundwater basin.

Without more, these provisions do not establish that water districts are *primarily* responsible for development and enforcement of environmental standards. To the contrary, the California Supreme Court has indicated the authority to regulate water for the protection of the environment is in the State Water Resources Control Board. *See Environmental Defense Fund, Inc. v. East Bay Municipal Utility District*, 26 Cal.3d 183, 198, 161 Cal.Rptr. 466, 473–74, 605 P.2d 1, 8–9 (1980)

■ The Westlands plaintiffs claim the California Water Code grants water districts

---

**12.** 42 U.S.C. § 4332(2)(C) states, in relevant part:

> Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to environmental impact involved. Copies of such statement *and the comments and views of the appropriate Federal,*

> State, and local agencies, *which are authorized to develop and enforce environmental standards,* shall be made available to the President, the Council on Environmental Quality, and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes.

the ability to commence and maintain any action "to carry out its purpose or protect its interests," or "to prevent interference with or diminution of the ... natural subterranean supply of waters which may ... be of common benefit to the land ... or endanger the land." Cal.Water Code §§ 35407, 3509; Water Code Appendix § 70–6. The Westlands plaintiffs do not explain how state law can overcome the Supremacy Clause of the U.S. Constitution, to eviscerate federal standing requirements under the APA. *Cf. Aminoil U.S.A., Inc. v. California State Water Resources Control Board*, 674 F.2d 1227, 1233 (9th Cir.1982) (fact that California courts are courts of general jurisdiction is not dispositive of fact that Congress' waiver of sovereign immunity within 42 U.S.C. § 702 was limited and subject to specific conditions; federal officials could not be subject to suit in state court). Westlands' or other plaintiffs status as local agencies that have statutory authority to address incidental environmental concerns, does not per se confer standing to maintain a NEPA claim.

### Water Districts And Association Standing.

■ Westlands and other plaintiffs claim NEPA standing based on their status as associations representing each district's water users. Federal courts employ a three-part test to determine whether an association may assert claims on behalf of its individual members.

[A]n association has standing to bring suit on behalf of its members when: 1) its members would otherwise have standing to sue in their own right; 2) the interests [the association] seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Government

agencies are not precluded from association standing, so long as factors are present that "assure that concrete adverseness which sharpens the presentation of issues." *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2442.

■ The movants argue that the water districts are unable to establish germaneness. As quoted above, the complaint alleges injury to the groundwater supply and quality, soil quality and air quality. The water districts assert that one of their purposes is to ensure that member water users have an adequate and secure supply of water.[13] Although insufficient to confer standing under *Port of Astoria*, these sections support the water districts' statutory purpose. Plaintiffs seek to protect their water supply by obtaining an injunction prohibiting the Bureau from releasing water for CVPIA implementation or to protect the Delta smelt until an EIS is prepared. The right asserted—to protect the water supply until an EIS is prepared—is germane to the water districts' purposes in maintaining a supply of clean water and protecting the groundwater quality, which are within the "zone of interests" of NEPA's purposes of protecting the environment. The association status of district plaintiffs coupled with their statutory purpose are sufficient for NEPA standing, as well as intervenor status under *Portland Audubon Society v. Hodel*, 866 F.2d at 308, n. 1.

### Merits Of The NEPA Claims.

### Major Federal Action.

### Generally.

The movants argue that their activity is not "major federal action," such that NEPA requires an EIS. The Code of Federal Regulations provides that a "major federal action:"

... includes actions with effects that may be major and which are potentially subject to federal control. Major reinforces, but does not have a meaning independent of significantly.[14]

---

13. The code sections cited above establish, water districts within California are empowered to adopt and implement groundwater management plans for the benefit of a groundwater basin. Cal.Water Code §§ 10753.

14. 40 C.F.R. § 1508.27 defines a finding that an agency action "significantly" affects the environment requires consideration of: 1) the short- and long-term *context* of the proposed action, which requires consideration of both the human and

40 C.F.R. 1508.18 (1991). The Code also contains categories into which various major federal actions "tend to fall." These include the "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. 1508.18(b).

The defendants place primary emphasis on two issues in arguing that no major federal action is presented by the circumstances of this case. In *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir.1990), the Ninth Circuit reaffirmed a long-standing principle that a federal action is not "major" for NEPA purposes where the agency activity does not change the status quo and was inferentially part of routine management action in the operation of the dam. *See also County of Trinity v. Andrus*, 438 F.Supp 1368, 1388 (E.D.Cal.1977) (ongoing agency activity must rise to the level of a "major federal action" to trigger NEPA's EIS requirement). Similarly, in *San Francisco v. U.S.*, 615 F.2d 498 (9th Cir.1980), the court held that no EIS was required for the Navy to lease its shipyard to a private ship repair company, despite a two year period of inactivity prior to the transfer. The court stated,

> It was not unreasonable to regard the leasing of the yard as a phase in an essentially continuous activity. In these circumstances the Navy was not required to evaluate the environmental consequences of the lease as if the Navy were proposing to establish this multi-million dollar industrial complex for the first time.

*Id.* at 501; see also *Robinswood Community Club v. Volpe*, 506 F.2d 1366, 1370 (9th Cir. 1974) (continued participation in highway construction project was not major federal action after final design stage.)

The determination "will, of necessity, depend heavily upon the unique factual circumstances of each case." *Westside Prop-*

*erty Owners v. Schlesinger*, 597 F.2d 1214, 1224 (9th Cir.1979). To some extent, the finding is based on whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved. *See Port of Astoria*, 595 F.2d at 476; *Robinswood Community Club*, 506 F.2d 1366. The inquiry requires a determination of whether plaintiffs have complained of actions which may cause significant degradation of the human environment. *San Francisco*, 615 F.2d at 500.

### Application To The Present Case.

The Federal Defendants argue that the water service contracts have consistently reserved to the government the ability to respond to changing legal and environmental conditions and that water allocation entails routine managerial actions within the ambit of the CVP Act, as originally enacted. Even a cursory review of its legislative history shows that the CVPIA was intended to have a significant impact on the environment of the Central Valley by the reallocation of a significant portion of CVP water to environmental purposes. Taking the allegations of the complaint as true, it cannot be said as a matter of law that the actions of the Federal Defendants in implementing the CVPIA do not constitute "major federal actions" beyond the scope of their normal operations.

That a new law was required is itself evidence of major federal action for which an EIS is required. 42 U.S.C. § 4332(2)(C). *See generally, Andrus v. Sierra Club*, 442 U.S. 347, 357–60, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979) (Stating approval of CEQ's guideline requiring EIS for "a bill or legislative proposal to Congress, but does not include requests for appropriations.").

According to the complaints, the Bureau has implemented the CVPIA by appropriation and diversion from agricultural to environmental use, of over 1.2 million acre feet of

---

national societal context, as well as that of the affected region; and 2) the *intensity*, or *severity*, of the proposed action, which must consider, *inter alia*, the degree to which the proposed action will affect the public health and safety, the unique characteristics of the geographic area, the

quality of the human environment, the cumulative impact of related actions, the degree to which an endangered or threatened species may be affected, and the possibility that the proposed action involves unique or unknown risks.

water. Before enactment of the CVPIA, officials at the Bureau estimated that approximately 7 to 8.6 million acre feet of water were delivered to the water districts; about ninety percent of the water was used for agricultural purposes. The complaints allege 50% to 75% reduction in the supply of water to contractors; these changes may worsen, depending upon the availability of water due to drought conditions. The Bureau is also alleged to be taking other measures, such as basing its yearly predictions on a 90% exceedence probability, to comply with the ESA, alleged to be arbitrary and unnecessary. According to the complaints, as a direct result of these changes in air and water pollution, soil subsidence, and diminution of soil quality and the quantity of groundwater will occur. These facts, taken as true, represent a change in normal CVP operations having a "significant effect on the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27.

**Irreconcilable Conflict.**

**Generally.**

■ Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires all agencies of the United States "to the fullest extent possible" to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a detailed statement by the responsible official on the environmental impact, analyzing the consequences of, and alternatives to, the proposed action. No party has furnished any such statement for the CVPIA. The congressional mandate that NEPA apply "to the fullest extent possible" was explained by its authors as follows:

The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in ... Section 102(2) unless existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible.... Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set

out in section 102.... No agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.

115 Cong. Record 39703 (1969), *quoted in, Calvert Cliff's Coordinating Committee, Inc. v. U.S. Atomic Energy Commission,* 449 F.2d 1109, 1114–15 (D.C.Cir.1971); *see also* 40 C.F.R. § 1500.4(a).

The Supreme Court has construed the phrase "to the fullest extent possible" in the following manner:

NEPA's instruction that all federal agencies comply with the impact statement requirement—and with all the other requirements of § 102—"to the fullest extent possible," is neither accidental nor hyperbolic. Rather, the phrase is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle. Section 102 recognizes, however, that where a clear and unavoidable conflict in statutory authorization exists, NEPA must give way. As we noted in *United States v. SCRAP,* 412 U.S. 669, 694[, 93 S.Ct. 2405, 2419, 37 L.Ed.2d 254] (1973), "NEPA was not intended to repeal by implication any other statute."

*Flint Ridge Development Co. v. Scenic Rivers Assoc.,* 426 U.S. 776, 787–88, 96 S.Ct. 2430, 2437–38, 49 L.Ed.2d 205 (1976). Where there is an "irreconcilable and fundamental" statutory conflict, no environmental impact statement is required. *Id.; Jones v. Gordon,* 792 F.2d 821 (9th Cir.1986). The existence of an irreconcilable and fundamental conflict gives rise to a potential exemption from the requirement for the preparation of an EIS.

For example, in *Flint Ridge,* the Court held that the Interstate Land Sales Full Disclosure Act was in fundamental conflict with NEPA, because the thirty-day time limit for a disclosure's finality could not be reconciled with the time necessary to complete an environmental impact statement. *Flint Ridge,* 426 U.S. at 789–90, 96 S.Ct. at 2438–39. The Court, in holding that no EIS was required, stated,

In sum, even if the Secretary's action in this case constituted major federal action significantly affecting the quality of the human environment so that an environmental impact statement would ordinarily be required, there would be a clear and fundamental conflict of statutory duty. The Secretary cannot comply with the statutory duty to allow statements of record to go into effect within 30 days of filing, ... and simultaneously prepare impact statements on proposed developments.

*Id.* at 791, 96 S.Ct. at 2439. Because of this "irreconcilable and fundamental" conflict of the Secretary's duties under both the Disclosure Act and NEPA, the Court found NEPA's impact statement requirement inapplicable. *Id.* In *Merrell v. Thomas,* 807 F.2d 776 (9th Cir.1986), *cert. denied* 484 U.S. 848, 108 S.Ct. 145, 98 L.Ed.2d 101 (1987), the Ninth Circuit examined the legislative language, purpose and history of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), to determine that its registration process was not subject to NEPA requirements. In *Merrell,* Congress had made several amendments without addressing the EPA's previous interpretation that FIFRA did not require compliance with NEPA and had enacted provisions to protect trade secret information. The Congressional Record indicated that the author of a proposed FIFRA amendment did not believe that NEPA currently applied, and the amendment was intended to merely "restate current law." *Id.* at 780. Although no express conflict existed between the two statutes, the court held that Congress did not intend NEPA to apply:

To apply NEPA to FIFRA's registration process would sabotage the delicate machinery that Congress designed to register new pesticides. It would increase a regulatory burden that Congress intentionally lightened in 1978 and create new opportunities for litigation where litigation was recently quelled.... We infer that Congress believes that analyses in support of registration currently are an adequate substitute for an EIS is the FIFRA context.

Congress did not intend to make NEPA apply.

*Id.* at 779.

In contrast, in *Forelaws on Board v. Johnson,* 743 F.2d 677 (9th Cir.1984), *cert. denied* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986), the Ninth Circuit held that a statutory requirement within the Pacific Northwest Electric Power Planning and Conservation Act that the Secretary commence contract negotiations "as soon as practicable within nine months after December 5, 1980," was reconcilable with NEPA, to require an environmental impact statement. The court based its holding on the following reasons: 1) Nothing in either the legislative history or language of the Act suggested that Congress intended to waive NEPA compliance; 2) The term "as soon as practicable" was not a mandatory time limit analogous to the thirty-day limit in *Flint Ridge,* and 3) NEPA's "to the fullest extent possible" requirement was to be construed broadly, in favor of requiring NEPA compliance. *Id.* 426 U.S. at 684–85, 96 S.Ct. at 2367–68.

Movants argue that the EIS requirement is avoided, because agency action directed by the CVPIA is in "irreconcilable and fundamental" conflict with NEPA. It is not suggested that the language of the CVPIA expressly exempts the Bureau's complained-of actions from NEPA's EIS requirement. The movants point to the following provisions to demonstrate this point:

(1) CVPIA § 3406(b) requires the Secretary, *"immediately upon enactment of this title,"* to operate the Central Valley Project "to meet all obligations of State and Federal law, including but not limited to the Federal Endangered Species Act...." (emphasis added).

(2) CVPIA § 3406(b)(2) directs that the Secretary "upon *enactment of this title* direct and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters ff the San Francisco Bay/Sacramento–San Joaquin Delta Estuary; and to help to

meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act."

(3) Under § 3406(b)(23), for water years 1992 through 1996, the Secretary must provide an instream release of water to the Trinity River of not less than three hundred and forty thousand acre-feet per year for the purposes of fishery restoration, propagation, and maintenance.

(4) Under § 3406(d), the Secretary must provide "dependable water supply needs" "*upon enactment of this title*" for habitat areas identified by the Bureau of Reclamation.

Unquestionably, the CVPIA was enacted with a sense of urgency. The legislative history states:

> Water development, most recently the CVP, has played a major role directly and indirectly in changing the California environment from what it once was. . . .
>
> Federal and state water development certainly excaberated the adverse impacts of earlier human activities, and the combined toll is profound . . . Because of conversion to agricultural production, Central Valley wetlands have been reduced to about four percent of their original 4.5 million acres. Riparian wetlands have declined to less than two percent of the original acreage. . . . A conservative estimate is that 100,000 acres of wetlands have been lost in the Central Valley since 1944 due to construction and operation of the CVP. . . .
>
> In average water years, 8 million Sacramento River salmon are diverted into the central and south delta areas and more than half of these die as a direct result. By one estimate, 60–80 percent of all Sacramento River juvenile salmon never make it past the Delta. Up to 95 percent of the entire San Joaquin River basin salmon production is lost to the pumps.
>
> Shasta Dam, closed in 1944, blocked spawning access to hundreds of miles of spawning area. The timing and temperature of releases from Shasta are often incompatible with fishery survival. Red Bluff Diversion Dam blocks or delays upstream migrating adults and exposes downstream migrating juveniles to predation. The average return of the Sacramento River full-run chinook in the 10 years preceding construction of Red Bluff Dam was 138,000. Average returns over the 24 years following construction is 73,000 fall-run chinook, a decline of 53 percent. The Tehama–Colusa spawning channel was supposed to provide for full migration for Red Bluffs impacts. The channel never worked and is essentially abandoned.
>
> As a result of these combined factors, the winter-run chinook of the Sacramento River has been reduced from a run of over 100,000 to fewer than 200 and, in 1989, was declared a threatened species under Federal law and an endangered species under state law.
>
> The Sacramento River produces four distinct races of chinook salmon: fall, late fall, winter and spring runs. More than 70 percent of all salmon caught off California come from the Sacramento River system. Most of these fish originate in the Sacramento above the confluence with the Feather river. Nearly 8,000 commercial fishermen depend on these salmon. All four Sacramento chinook races have declined substantially. The fall run, which accounts for nearly 90 percent of the total ocean catch off California, is presently about 50 percent of historic numbers; the late fall run has declined a similar amount; the winter run has declined 98 percent since 1966; and the wild strain of the spring run numbers only a few hundred and remains in only two or three tributary streams. . . .

House Report, at 17–19.

Upon the CVPIA's enactment, Congress required the Secretary "immediately upon enactment of this title," to operate the Central Valley Project "to meet *all* obligations of State and Federal law, including *but not limited to* the Federal Endangered Species Act. . . ." Section 3406(b)(2) directs that the Secretary "upon enactment of this title" direct and manage, annually, eight hundred thousand acre-feet of Central Valley Project

yield "for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title" as well as "to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act." Although the language conveys a sense of urgency, Congress acknowledged that other legal obligations under all federal law had to be satisfied. Congress could easily have excused NEPA compliance had it intended.

Section 3404(c), concerning water contracts, requires an EIS for every renewed contract. Section 3505(1) for water transfers from the CVP are made subject to compliance with federal law. Section 3406(b) requires the Secretary to immediately operate the CVP to meet all obligations of state and federal law, including, but not limited to the ESA. Thus, all operative provisions of the CVPIA are expressly subject to federal law, without excluding the applicability of NEPA. In NEPA's legislative history, it was emphasized that "no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." 115 Cong. Record 39703 (1969), *quoted in, Calvert Cliff's Coordinating Committee,* 449 F.2d at 1114–15; *see also Forelaws on Board,* 743 F.2d at 684–85 (statutes should be construed in favor of requiring NEPA compliance).

Additionally, in CVPIA § 3409, the Secretary is directed to prepare a NEPA programmatic environmental impact statement not later than three years after the CVPIA enactment, to consider "all impacts and benefits within the Sacramento, San Joaquin, and Trinity River basins, and the San Francisco Bay/Sacramento–San Joaquin River Delta Estuary," associated with CVP water contract renewals. This requirement does not constitute a Congressional substitute for the traditional timing of NEPA obligations, rather it assures that within three years following enactment of the CVPIA, renewal of all existing CVP water contracts will be subject to programmatic environmental review. The

legislative history of section 4, now codified at § 3409, which governs limitations on water contracts and contract reform, reveals:

This subsection requires that within 3 years the Secretary must prepare a programmatic environmental impact statement analyzing the impacts of renewing all existing CVP water contracts. The statement will review all impacts, including those on the Sacramento, San Joaquin, and Trinity river basins, and the San Francisco Bay/Sacramento–San Joaquin River Delta and Estuary.

It is obvious that renewing all existing contracts will have a significant impact on the areas identified in the previous paragraph. The programmatic environmental impact statement required by this subsection will identify those impacts and assist the Secretary by identifying changes that will have to be made in renewed contracts....

... This section is intended to ensure maximum flexibility and consistency in the long-term operation of the CVP *and is not intended to affect any existing requirements of NEPA.*

Central Valley Project Reform Act, H.Rep. No. 576, Pt. 1, 102d Cong. (June 16, 1992). Given the construction required by the term "to the fullest extent possible," and taken as a whole, the CVPIA does not impliedly repeal NEPA's requirement for an EIS. Although unquestionably passed with a sense of urgency for the protection of threatened species, the requirement that statutes be construed in favor of NEPA compliance and legislative history demonstrating an intent that "existing requirements of NEPA" not be affected, prevent granting the motion to dismiss on this ground.

■ The environmental intervenors argue that, even if an EIS is prepared, it would be rendered a nullity under the CVPIA's mandate that specified portions of CVP water be used for fish and wildlife preservation. This argument assumes that the CVPIA leaves no discretion as to the method of its implementation—an argument not borne out by the statute's language, nor the detailed requisites of compliance that must be satisfied by the Secretary under Section

3406(b)(1) through (3). The argument also ignores the purpose that an EIS was intended to serve:

It ensures that the agency, in reaching a decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.... Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast....

Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process....

To be sure, one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences.... Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of adverse effects. An adverse effect that can be fully remedied by, for example, an inconsequential public expenditure is certainly not as serious as a similar effect that can only be modestly ameliorated through the commitment of vast public and private resources....

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–52, 109 S.Ct. 1835, 1845–47, 104 L.Ed.2d 351 (1989). NEPA is a procedural statute: It was not intended to—and indeed cannot—direct a substantive outcome, because an agency is not constrained from deciding that more important concerns outweigh the adverse environmental effects outlined within an EIS. *Id.* at 350, 109 S.Ct. at 1846. But the information it contains can inform the discretion by which the Bureau has selected which CVP water will implement the CVPIA.

The Secretary may utilize a "fast track" EIS schedule to expedite the process. 40 C.F.R. § 1506–10(d). Moreover, where Congress has provided flexibility to federal agencies to control relevant deadlines, NEPA compliance is not necessarily precluded. *Jones v. Gordon*, 792 F.2d 821, 826–27 (9th Cir.1986). Major federal actions are effected by the reallocation from agricultural use of over 1.2 million acre feet of water. NEPA requires an agency to address all significant alternatives to a proposed action. See 42 U.S.C. § 4332(2)(C); *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). Nothing in the language and history of the CVPIA nor in any specifically mandated deadline in the act, requires the conclusion that a clear and irreconcilable conflict between the CVPIA and NEPA exists. This does not preclude an evidentiary showing by the Federal Defendants that NEPA compliance is impossible.

**NEPA And The Biological Opinions.**

Movants seek to dismiss the claim that the biological opinions require the preparation of an EIS, because biological opinions are merely advisory documents, not binding "major federal actions." Plaintiffs argue that an action which is one of several systematic and connected agency decisions, resulting in the allocation of federal resources to implement a statutory program, the CVPIA, is "major federal action." *See* 40 C.F.R. § 1508.-18(b)(3). Formal plans and official documents that guide or prescribe alternative uses, on which future agency action will be based, are "federal actions" for NEPA purposes. *See* 40 C.F.R. § 1508(b)(2).

 Plaintiffs argue that a biological opinion that suggests reasonable and prudent alternatives falls within either definition, because an agency must either follow the alternative suggested or risk violation of ESA § 7(a)(2). Where an agency takes major actions with regard to a fully operational project, in existence before NEPA, which occurs after NEPA's effective date, an EIS is required. *Port of Astoria*, 595 F.2d at 479. According to Plaintiffs, the biological opinion adopted by the Bureau was part of a chain of events that resulted in the Bureau's reallocation decisions and a revision of existing Bureau operational standards or procedures for the CVP. Taken together, those events resulted in a major federal action having a

significant effect on the human environment, an EIS was required.

*Upper Snake River*, 921 F.2d at 235, is distinguishable. There the Bureau was found to have revised operating procedures or standards to alter the status quo. Here the taking of water for non-agricultural purposes is alleged to have changed the operational requirements of the CVP, imposed new standards for reverse flow in the Western Delta, carryover storage in the Shasta reservoir, and caused closure of the Delta cross-channel. Such actions and the environmental effects alleged are not routine managerial changes.

A biological opinion is part of the ESA process originated by 16 U.S.C. § 1536(a)(2), which requires federal agencies, with the assistance of the Secretary, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species." The federal agency undertaking such activity must consult the service having jurisdiction over the relevant endangered species. 16 U.S.C. § 1536(a)(3). The U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), are jointly responsible for administering the ESA.[15] 50 C.F.R. § 402.01(b) (1992). The consulting service then issues a biological opinion that details how the proposed action "affects the species or its critical habitat," including the impact of incidental takings of the species.[16] 16 U.S.C. § 1536(b)(3)(A).

"The agency is not required to adopt the alternatives suggested in the biological opinion; however, if the Secretary deviates from them, he does so subject to the risk that he has not satisfied the standard of Section 7(a)(2)." *Tribal Village of Akutan v. Hodel,* 869 F.2d 1185, 1193 (9th Cir.1988) (citation omitted), *cert. denied,* 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989). A Secretary can depart from the suggestions in a biological opinion, and so long as he or she takes "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species," no ESA violation occurs. *Id.* at 1193–95; *Pyramid Lake Paiute Tribe of Indians v. Department of Navy,* 898 F.2d 1410, 1418 (9th Cir.1990) ("a non-Interior agency is given discretion to decide whether to implement conservation recommendations put forth by the FWS"). The Joint Regulations state:

> The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

50 C.F.R. § 402.14(j) (1992). 50 C.F.R. § 402.15(a) states:

> (a) Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.

Courts have attempted to define the "point of commitment," at which the filing of an EIS is required, during the planning process of a federal project. *See Sierra Club v. Peterson,* 717 F.2d 1409, 1414 (D.C.Cir.1983). "An EIS must be prepared before any irreversible and irretrievable commitment of resources." *Conner v. Burford,* 848 F.2d 1441, 1446 (9th Cir.1988), *cert. denied* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). 40 C.F.R. § 1502.5(a) similarly provides, "For projects directly undertaken by Federal agencies, the environmental impact statement shall be prepared at the feasibility analysis (go/no go) stage and may be supplemented at a later stage if necessary."

KWA points out that the Environmental Review Procedures, under the National Oceanic and Atmospheric Administration ("NOAA")[17] Order No. 216–6, § 6.02.c.2(d), require an EIS for:

---

**15.** The scope of each agency's jurisdiction is defined in 50 C.F.R. § 402.01. No party questions whether the Biological Opinion here was properly issued by the NMFS.

**16.** An *incidental taking* "refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02 (1992).

**17.** The NMFS is a division within the NOAA.

Federal plans, studies, or reports prepared by NOAA that *could determine the nature of future major actions to be undertaken by NOAA or other federal agencies* that would significantly affect the quality of the human environment.

It is undisputed that the NMFS's actions are subject to an EIS requirement, if those actions are a "major federal action significantly affecting the human environment." Under 40 C.F.R. § 1508.18(b)(2), an activity is a federal action if it "guides," rather than binds, the use of federal resources. CVP water is a federal resource. The Bureau's options were narrow had it declined to follow the NMFS's reasonable and prudent alternatives. *See Tribal Village of Akutan*, 869 F.2d at 1193 (agency need not adopt reasonable and prudent alternatives in biological opinion, so long as it complied with ESA Section 7(a)(2) by taking "alternative, reasonably adequate steps to insure the continued existence of any endangered or threatened species"); *Portland Audubon Society v. Endangered Species*, 984 F.2d 1534, 1537 (9th Cir.1993) (discusses exemptions from ESA, by application to the Committee under 16 U.S.C. §§ 1536(a)(2), (g)(1)–(2)).

The government submits *Bennett v. Plenert*, CV–93–6076, 1993 WL 669429 (D.Or.1993), as authority that biological opinions are not binding on federal agencies, and consequently are not major federal actions. But in *Bennett*, the court left open the issue that a biological opinion could constitute a major federal action under NEPA. *Id.* at p. 11, n. 4. Biological opinions are not binding on the Secretary, nor do they invariably require an EIS. The inquiry requires a case by case analysis.

Taking the facts alleged in the plaintiffs' complaints as true, the biological opinion is part of a systematic and connected set of agency decisions which result in the commitment of substantial federal resources for a statutory program, which resulted in reallocation of over 225,000 acre feet of CVP water under the ESA for salmon protection with the environmental impacts alleged. This is NEPA major federal action.

## NEPA REDUNDANCY

■ The government suggests plaintiffs seek simultaneous and redundant NEPA analysis by NMFS and the Bureau. No complainant seeks such relief. 40 C.F.R. § 1501.5 *et seq.* prescribes the procedure where more than one federal agency is interested in action which requires an EIS by providing a designation of a lead agency, and 40 C.F.R. § 1502.25 calls for integrated preparation of an EIS to the fullest extent possible. *See Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir.1986). It is left to the agencies to coordinate their EIS efforts.

The biological opinion developed by NMFS provides for specific revisions to the procedures and standards for operation of the CVP, which the Bureau was obligated to consider, unless an express exemption was obtained under 16 U.S.C. § 1536(h). Alleged redundancy is not a bar to relief. Under these circumstances, NEPA compliance for a programmatic EIS is not precluded unless it can be shown that the systematic and connected agency decisions for the CVPIA could not be coordinated.

## Unavoidable Conflict With The Consultation Process.

■ The parties argue extensively over whether an "unavoidable conflict" exists between agency consultation and NEPA compliance, to excuse any EIS requirement under the authority of *Flint Ridge*, 426 U.S. at 789–90, 96 S.Ct. at 2438–39. Under 16 U.S.C. § 1536(b)(1)(A), consultation "shall be concluded within the 90–day period beginning on the date on which initiated, or ... within such other period of time as is mutually agreeable to the Secretary and the Federal agency." The Supreme Court has estimated that "draft environmental impact statements on simple projects prepared by experienced personnel take some three to five months to complete, at least in the Department of the Interior. Complex projects prepared by inexperienced personnel may take up to 18 months to prepare." *Flint Ridge*, 426 U.S. at 788 n. 10, 96 S.Ct. at 2438 n. 10. Moreover defendants claim that public comment on agency documents in the EIS process conflicts with the secrecy by which federal agencies conduct their consultation under Section 7 of the ESA.

Plaintiffs refer to *Jones v. Gordon*, 792 F.2d at 826–27, to argue that NEPA compliance is not precluded where Congress has provided for agency flexibility to control deadlines. Section 7 of the ESA gives agencies control over the time within which consultation is to be concluded 16 U.S.C. § 1536(b)(1)(A). The period is 90 days, or subject to subsection B, such other period of time as is mutually agreeable to the Secretary and the Federal Agency. *See also*, 40 C.F.R. § 402.14(e). The biological opinion consultation here was initiated by NMFS in February, 1991, and extended for almost two years. (Friant Request for Judicial Notice, Exhibit 1.) The agencies have it within their authority to control environmental review timetables and to co-ordinate and phase the timing of their efforts.

The secrecy concern of the government does not create an irreconcilable and fundamental conflict. ESA § 7 provides for the inclusion of "applicants" within the consultation process, which demonstrates access to the ESA process by interested parties. The concerned agencies can coordinate and manage the NEPA input rules, accommodating with any need for confidentiality in application of the ESA, by informed efforts at coordination and management of the process. No statutory prohibition exists to prevent such coordination in preparation of an EIS. Neither timing nor secrecy concerns bar the ability to comply with NEPA.

### ESA Claims.

The complaints challenge the sufficiency of the NMFS's Winter Run biological opinion directly under the ESA, for the NMFS's failure to consider, or balance, the economic impacts of its reasonable and prudent alternatives.

### Standing Under The ESA.

■■■ The parties disagree on the proper test to determine whether a party has standing to bring an ESA claim.[18] Plaintiffs deny the "zone of interests" test is applicable, asserting that only the "constitutional core" requirements of Article III must be met. Under the ESA, "The plain intent of Con-

gress in enacting this statute was to halt and reverse the trend toward species extinction." 16 U.S.C. § 1531(b). *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184–85, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978). This statement of the government suggests the plaintiffs' interests are in maximizing their ability to obtain CVP water: more water available for the plaintiffs is less water for threatened species and their habitat. It is said the plaintiffs' interests are adverse toward "reversing the trend toward species extinction: "they are outside the 'zone of interests' of the ESA."

This prudential limitation has been examined by *Clarke v. Securities Industry Ass'n.*, 479 U.S. 388, 400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987): "The test denies a right of review if the plaintiffs' interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke* establishes that there need only be a 'plausible relationship' between the interests of the litigants and the policies embodied in 'the overall context' of the statutes at issue. *Id.* 479 U.S. at 401–02, 107 S.Ct. at 758–59.

16 U.S.C. § 1540(g) is the ESA's "citizen suit" provision: "any person may commence a civil suit on his own behalf—a) to enjoin any person, including the United States [and its agencies], who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof...." Under 16 U.S.C. § 1532(13), "persons" includes organizations and state agencies. The plaintiffs argue that suit brought under a statutory provision authorizing "any person" to sue, removes the prudential requirements from the standing inquiry. *See Gladstone Realtors v. Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (Fair Housing Act). In *Alvarez v. Longboy*, 697 F.2d 1333, 1336 (9th Cir.1983), the Ninth Circuit construed a provision within the Farm Labor Contractor Registration Act that permitted "any person aggrieved" to bring suit. The court stated, "This language is patterned after language defining standing under the fed-

---

**18.** Environmental Intervenors have not moved to dismiss the ESA claims, rather they have re-

served their attack on these claims for resolution by dispositive motion.

eral Civil Rights statutes, and ... show[s] a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Id.* In *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court examined standing under the ESA "citizen suit" provision, and found the plaintiff lacked Article III standing, without referencing, or discussing the "zone of interests" test. At least one district court within the Ninth Circuit has held that an ESA plaintiff need only meet the Article III requirements for standing. *Swan View Coalition, Inc. v. Turner,* 824 F.Supp. 923, 928–29 (D.Mont.1992).

The Federal Defendants argue that the Ninth Circuit resolved the issue by implication in *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1581 n. 8 (9th Cir.1993). There, the court analyzed standing under section 10(a) of the APA, and applied the "zone of interests test." In a footnote, the court, without analysis, applied its APA standing discussion to the plaintiff's standing under the ESA. *Id.; see also Dan Caputo Co. v. Russian River County Sanitation District,* 749 F.2d 571 (9th Cir.1984) (applying zone of interests test under the Clean Water Act, which has a citizen suit provision). The Federal Defendants further point out that the DC Circuit has twice held that standing under the ESA requires a "zone of interests" inquiry. *National Audubon Society v. Hester,* 801 F.2d 405, 407 (D.C.Cir.1986); *Humane Society of the United States v. Hodel,* 840 F.2d 45 (D.C.Cir.1988).

*Clarke v. Securities Industry Association, supra,* 479 U.S. at 398–99 n. 16, 107 S.Ct. at 757 n. 16, discusses the "zone of interests" test:

> The principal cases in which the "zone of interest" test has been applied are those involving claims under the APA, *and the test is most usefully understood as a gloss on the meaning of [5 U.S.C.] § 702.* While inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a "zone of interest" inquiry on the APA, it is not a test of universal application.... [T]he invocation of the zone of interest test [in *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S.

318[, 97 S.Ct. 599, 50 L.Ed.2d 514] (1977) ], should not be taken to mean that the standing inquiry under whatever constitutional or statutory provision a plaintiff asserts is the same as it would be if the "generous review provisions" of the APA apply.

A leading treatise notes, "The most obvious reading [of *Clarke* ] would be to limit the test to administrative review proceedings under § 10 of the APA," and that "[b]eyond this point, only the brave would venture to illuminate the obscure hint that other settings will support different prudential tests that somehow resemble the zone of interests test." 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3531.7 (Supp.1993). Notwithstanding this commentary, the defendants observe that under a zone of interests analysis, plaintiffs' concern is not protection of endangered species or their habitat.

Plaintiffs reply that their claims address at least two relevant purposes of the ESA: 1) that federal agencies cooperate with state and local agencies to resolve water resource issues in concert with actions for conservation of species (16 U.S.C. § 1531(c)(2)); and 2) economic and technological feasibility of reasonable and prudent alternatives were not analyzed by the NMFS biological opinion, which failed to consider economic impacts on the disputed service areas in violation of 16 U.S.C. § 1536(b)(3)(A) and 50 C.F.R. § 402.-02. No defendant suggests that alleged violation of the ESA will not result in direct harm to plaintiffs.

Plaintiffs' alternatively claim that they are "persons" within the meaning of ESA §§ 1540(g) and 1532(13) and therefore authorized to seek to enjoin the government's alleged violation of the ESA. Plaintiffs' assertion that the citizen-suit provision, § 1540(g), allows anyone to file suit in federal court to challenge the government's failure to comply with the ESA has been addressed in *Lujan v. Defenders of Wildlife, supra,* —— U.S. at —— - ——, 112 S.Ct. at 2842–43. An ESA complaint that asserts only the right to require that the government correctly apply the law does not state an Article III case or controversy. *Fairchild v. Hughes,* 258 U.S. 126, 129–130, 42 S.Ct. 274, 275, 66 L.Ed. 499

(1922). Moreover, the concurring opinion in *Lujan v. Defenders of Wildlife* appositely notes that the citizen-suit provision of § 1540(g)(1)(A), "does not of its own force establish that there is an injury in 'any person' by virtue of any 'violation.' *Id.* at p. 2147.

Here, plaintiffs allege actual and substantial injury from the failure to comply with the ESA, i.e., deprivation of their alleged water rights which will harm the environment. The deprivation is said to be caused in part by failure to comply with ESA requirements for: 1) concerted consultation with concerned agencies to resolve water resource issues; and 2) that reasonable and prudent determinations chosen, be economically and technologically feasible. These allegations are sufficient to confer standing under either the citizen-suit provisions of the ESA or a zone of interests analysis. The motions to dismiss the ESA claims for lack of standing are denied.

### KWA ES Claims

■ KWA additionally complains the NMFS violated the ESA by failing to include it as a party to the ESA Section 7 consultation on CVP operations. 16 U.S.C. § 1531(c)(2) states:

It is further declared the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

The Federal Defendants argue that policy statements within federal statutes, do not, as a matter of law, create substantive rights. *See Ass'n of American Railroads v. Costle*, 562 F.2d 1310 (D.C.Cir.1977). However, as *Clarke, supra,* 479 U.S. at 401, 107 S.Ct. at 758, establishes, in determining standing "the court is not limited to condensing the statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress' overall purposes in the ... Act."

KWA argues that § 1531(c)(2) supports its claim under the citizen-suit provision of 16 U.S.C. § 1540(g) and cites *Defenders of the Wildlife v. EPA*, 882 F.2d 1294 (8th Cir. 1989), which observes that the policy statement of § 1532(c)(1) imposed "substantial and continuing obligations on federal agencies." The relevance of § 1531(c)(2) is that the concerned federal agencies are directed to cooperate with local agencies to resolve water resource issues in conservation efforts. Here, it is alleged defendants consulted with no local agency in reaching their decisions to reallocate contracted CVP water. This alleged failure to comply with specific provisions of the ESA coupled with alleged resulting harm to plaintiffs is sufficient to provide standing under the ESA.

### Merits Of The ESA Claim.

■ The plaintiffs allege that the "reasonable and prudent alternative" presented in the NMFS Biological Opinion concerning preservation of the winter-run Chinook salmon fails to balance, or even consider, the economic or environmental impact on contractors south of the Sacramento–San Joaquin delta. The BO is claimed to be defective because the proposed alternative is arbitrary, capricious and an abuse of discretion, which is sufficient to provide notice of claimed improper agency action in violation of the APA. 5 U.S.C. § 706(1).

The Defendants counter that the ESA imposes no duty to balance economic impact to the plaintiffs when choosing reasonable and prudent alternatives. 16 U.S.C. § 1536(b)(3)(A) requires that reasonable and prudent alternatives be suggested if a consulting agency concludes that a threatened or endangered species will be jeopardized by an agency's proposed actions. 50 C.F.R. § 402.02 defines *reasonable and prudent alternatives* as:

... alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, *that is economically and technologically feasible,* and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

Defendants argue that "economically and technologically feasible" refers to *feasibility* of proposed alternatives, but imposes no duty

to consider *economic effects* on third persons who have no interest in species or habitat.

Plaintiffs' argue, without reference to statutory or case authority, that § 402.02 imposes a duty on the consulting agency to evaluate and balance the economic impacts *on the affected geographic and economic area* against the presumed benefits of the proposed alternative. The plaintiffs suggest that, because in the present case the alternative presented made no effort to identify, evaluate, or balance the economic effects on the service area of the CVP, the biological opinion is defective. Plaintiffs do not claim their lands or facilities contain threatened species or critical habitat.

Even if the economic feasibility referenced in § 402.02 describes only the cost to the agency to implement the reasonable and prudent alternative to protect species or habitat, under the facts alleged, the economic feasibility of the alternative chosen by the Bureau could be identical to or more economically burdensome than a water allocation decision that would not reduce plaintiffs' contract entitlements, which would make the chosen alternative arbitrary or capricious. The complaint sufficiently raises the issue of economic feasibility under 40 C.F.R. § 402.02 to state a cognizable claim.

Moreover, Westlands' asserts "the NMFS 'reasonable and prudent alternative' is based in part on a finding that reverse flow caused by the Delta water export activities would prevent recovery of winter-run Chinook Salmon. There is no scientific basis for this finding." Westlands Complaint, at ¶ 59. Although judicial review of agency action is limited and deferential, selecting a biological opinion alternative without any scientific basis could be arbitrary and capricious. The motions to dismiss the ESA claims are denied.

## CONCLUSION

These pleading motions seek to terminate all the claims in the cases as a matter of law without the taking of evidence, hearing of dispositive motions, or trial on the merits. For many of these plaintiffs, more than thirty years of contract history for CVP water exists. The language of the contracts is not unambiguous on allocation of risk or applicability of the sovereign act doctrine. Substantial issues are raised as to whether parties contracting with the U.S. Bureau of Reclamation have any enforceable water rights previously granted by existing long term contracts. The Bureau claims they have none. The contract issues presented cannot be decided on the face of the pleadings.

Defendants argue to foreclose NEPA compliance, environmental assessment, and preparation of an EIS for enactment and implementation of the CVPIA and water reallocation decisions under the ESA. It cannot be credibly argued that the disputed water allocation decisions are not major federal action, or that they do not significantly affect the human environment. Nor is it clear that Congress intended the CVPIA to supplant NEPA or to immunize the Bureau's actions from judicial scrutiny.

ESA claims are sufficiently pleaded to enable judicial review of the efficacy of statutory compliance with the ESA, the NFMS biological opinion, and the prudent alternative selected.

For the reasons stated, it is ORDERED:

1) The motions to dismiss due process claims of Westlands Water District and Area I under their contract are GRANTED, on the grounds that collateral estoppel precludes relitigation of whether they have an absolute vested contract right to CVP water, that cannot be altered by the Federal Defendants' reasonable actions taken pursuant to subsequent valid legislation.

2) The motion to dismiss due process claims of Westlands Water District and Area I for the breach and/or impairment of contract obligations are DENIED to the extent their claims for breach of contract are on the grounds that the Bureau's actions are arbitrary, capricious and/or contrary to law.

3) The motions to dismiss all other plaintiffs' claims based on a due process deprivation of vested contract rights to water under the Fifth Amendment are DENIED.

4) The motions to dismiss the Westlands and Area I plaintiffs' claims for deprivation of due process for the imposition of assess-

ments are GRANTED, with ten (10) days leave to amend.

5) The motions to dismiss Westlands, Area I and the Stockton plaintiffs' fifth claims for a governmental taking without just compensation in violation of the Fifth Amendment are GRANTED, with ten days leave to amend, and without prejudice to bringing that claim in the Court of Claims.

6) The motions to dismiss all plaintiffs' NEPA claims are DENIED.

7) The motions to dismiss all plaintiffs' ESA claims for relief are DENIED.